FILED

12/16/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0523

DA 19-0523

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 317

SUSAN HENSLEY,

      Petitioner and Appellant,

   v.

MONTANA STATE FUND,

      Respondent and Appellee.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2013-3235
                      Honorable David M. Sandler, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            E. Kiel Duckworth (argued), Duckworth Law Office, P.C., Ronan, Montana

            Matthew J. Murphy (argued), Murphy Law Firm, Great Falls, Montana

            Ben A. Snipes, Ross T. Johnson, Kovacich Snipes Johnson, P.C., Great Falls, Montana

      For Appellee:

            Bradley J. Luck (argued), Tessa A. Keller, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

            Thomas E. Martello, Montana State Fund, Helena, Montana

      For Amicus Workers' Injury Law and Advocacy Group:

            Kathleen G. Sumner, Law Offices of Kathleen G. Sumner, Hampstead, North Carolina

            Paul Odegaard, Odegaard Miller Law, PLLC, Billings, Montana

                 Argued and Submitted:  July 8, 2020
                           Decided:  December 16, 2020

Filed:

_____
                Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Susan Hensley appeals the Workers' Compensation Court's ("WCC") ruling that § 39-71-703(2), MCA, does not violate her right to equal protection of the law by denying an impairment award to a worker with a Class 1 impairment who has suffered no wage loss. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In January 2012, Hensley suffered a shoulder injury while working as a paramedic for Polson Ambulance. Her duties at the time included heavy-labor reaching and heavy weight-bearing activities. Hensley filed a workers' compensation claim that month and Montana State Fund ("MSF"), the company's insurer, accepted liability. Hensley's injury left her unable to work from mid-February 2012 through late-May 2013. During that time, Hensley was diagnosed with a glenoid labral tear of her left shoulder, for which she received surgery in March 2012. Hensley received $33,156.81 in medical benefits and $34,169.70 in disability benefits from MSF during this time.

¶3 In mid-May 2013, Hensley's doctor released her to return to work on "full shifts" with "no restrictions on lifting" but with requested back-up for some activities. She returned at the same hourly rate as before the accident. A few weeks later, Hensley was declared at maximum medical improvement ("MMI"), though she continued to report ongoing pain and loss of sensation when engaged in overhead activity. She last saw her treating physician in October 2013 and reported "mild tingling and numbness into the arm, but overall . . . feeling good." Hensley since has completed her nursing degree and works full-time as a registered nurse while also continuing to work part-time at

2

Polson Ambulance. Both employers pay her a rate of pay higher than the rate she received when she returned to work in 2013.

¶4    After Hensley reached MMI, her treating physician also assigned her a four percent whole person impairment rating, pursuant to the Sixth Edition of the *AMA Guides to the Evaluation of Permanent Impairment* ("*Guides*"). Hensley's whole person impairment percentage, when considered together with the nature of her injuries, is a Class 1 impairment under the *Guides*. This classification made Hensley ineligible for an impairment award under § 39-71-703(2), MCA. That statute allows impairment awards for claimants without actual wage loss only if they have a Class 2 or higher impairment rating.

¶5    Hensley petitioned for trial before the WCC in October 2013. She asserted that § 39-71-703(2), MCA, violates the Equal Protection and Due Process Clauses of the Montana Constitution and that the MSF should pay an impairment award for her four percent whole person impairment rating. On the basis of stipulated facts, both parties moved for summary judgment. In an order issued August 22, 2019, the WCC granted MSF's motion for summary judgment and denied Hensley's, ruling that § 39-71-703(2), MCA, does not violate equal protection, and declined to rule on Hensley's due process claim. Hensley appeals, arguing the WCC erred in its determination that § 39-71-703(2), MCA, does not violate the Equal Protection Clause of the Montana Constitution. She does not appeal on the due process claim.[1]

---

[1] Hensley notes that generally, "due process in the workers' compensation context examines whether a claimant is afforded enough benefits to sustain the *quid pro quo* for the exclusive

## STANDARD OF REVIEW

¶6    We review a court's grant of summary judgment de novo. *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 14, 374 Mont. 453, 325 P.3d 1211. Where there are no genuine issues of material fact, we determine whether the moving party is entitled to judgment as a matter of law. *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 9, 353 Mont. 265, 222 P.3d 566.

¶7    We review for correctness a court's conclusions of law on the constitutionality of a statute. *Goble*, ¶ 14. "The constitutionality of a legislative enactment is prima facie presumed." *Satterlee*, ¶ 10 (citing *Powell v. State Comp. Ins. Fund*, 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877). The party challenging the constitutionality of a statute bears the burden of proving the statute unconstitutional beyond a reasonable doubt. *Goble*, ¶ 15 (citing *Henry v. State Comp. Ins. Fund*, 1999 MT 126, ¶ 11, 294 Mont. 449, 982 P.2d 456). We ask not "whether it is possible to condemn, but whether it is possible to uphold" the challenged statute. *Satterlee*, ¶ 10 (quoting *Powell*, ¶ 13). If any doubt exists, it must be resolved in favor of the statute. *Powell*, ¶ 13. *See also Robinson v. State Comp. Mut. Ins. Fund*, 2018 MT 259, ¶ 13, 393 Mont. 178, 430 P.3d 69.

## DISCUSSION

¶8    Because the parties stipulated to the facts, the issue is whether the WCC correctly entered judgment as a matter of law that § 39-71-703(2), MCA, is constitutional. We apply the statute in effect in 2012, when Hensley was injured. *Goble*, ¶ 16.

---

remedy. Here, Hensley is not arguing § 703(2) undermines the *quid pro quo*." Hensley thus is not making a discrete claim that the statute undermines the quid pro quo.

4

Section 39-71-703, MCA (2011), provides compensation to workers for permanent partial disability. Permanent Partial Disability ("PPD") is defined as:

> a physical condition in which a worker, after reaching maximum medical healing:
>
> (a) has a permanent impairment, as determined by the sixth edition of the American medical association's Guides to the Evaluation of Permanent Impairment, that is established by objective medical findings for the ratable condition. The ratable condition must be a direct result of the compensable injury or occupational disease and may not be based exclusively on complaints of pain.
>
> (b) is able to return to work in some capacity but the permanent impairment impairs the worker's ability to work; and
>
> (c) has an actual wage loss as a result of the injury.

Section 39-71-116(27), MCA (2011). A worker has actual wage loss when "the wages that a worker earns or is qualified to earn after the worker reaches maximum healing are less than the actual wages the worker received at the time of the injury." Section 39-71-116(1), MCA (2011).

¶9 Subsection (2) of § 39-71-703, MCA, allows a worker—though ineligible for PPD benefits—to nonetheless receive payment of an impairment award when the worker has no actual wage loss from the injury, but only if the worker receives a Class 2 or greater class of impairment. Subsection (2), which remains unchanged from the 2011 version of the statute, reads in full:

> When a worker receives a Class 2 or greater class of impairment as converted to the whole person, as determined by the sixth edition of the American medical association Guides to the Evaluation of Permanent Impairment for the ratable condition, and has no actual wage loss as a result of the compensable injury or occupational disease, the worker is eligible to receive payment for an impairment award only.

5

Section 39-71-703(2), MCA.

¶10 Section 39-71-703, MCA, is part of Montana's comprehensive workers' compensation system, which—with few exceptions not applicable here—is the sole method of recovery for workers injured on the job. Section 39-71-411, MCA. The 2011 Legislature enacted a series of changes to the workers' compensation system through House Bill 334, 62nd Leg., Reg. Sess. (Mont. 2011) ("HB 334"). HB 334 updated to the Sixth Edition the version of the *Guides* referenced throughout the workers' compensation statutes and amended § 39-71-703(2), MCA, to limit impairment-only awards to claimants with no actual wage loss and a Class 2 or greater class of impairment. Before then, any claimant with no actual wage loss and an impairment rating was eligible for an impairment award. Section 39-71-703(2), MCA (2009).[2]

¶11 The Legislature has used the *Guides* for more than thirty years to establish a worker's impairment rating. *See* § 39-71-711(1)(b), MCA (1989). Similar to the Fifth Edition of the *Guides*, the Sixth Edition defines "impairment" as "[a] significant

---

[2] Hensley points out that Montana is the only state to use the Class rating as the basis for an impairment-only award in workers' compensation matters. Many state statutes, however, simply adopt the most recent version of the Guides without legislative review upon the publication of a new version. *See, e.g.* Alaska Stat. § 23.30.190(d); Wyo. Stat. Ann. § 27-14-405(g); 820 Ill. Comp. Stat. Ann. 305/8.1B(a). Others do not have comparable statutes providing for an impairment award for injury without wage loss. Amicus Workers' Injury Law and Advocacy Group points to one state—North Dakota—that restricts impairment-only awards to those who suffer a 14% or greater whole-body impairment as determined in accordance with the Sixth Edition of the *Guides*. N.D. Cent. Code § 65-05-12.2.8, 12.2.10. Outside the workers' compensation context, Class is used as a cutoff for silicosis litigation in several states. *See, e.g.* Tex. Civ. Prac. & Rem. Code Ann. § 90.004; Tenn. Code Ann. § 29-34-304; Ohio Rev. Code Ann. § 2307.85 (all requiring a Class 2 or higher impairment in order to assert a tort claim for silicosis). Regardless of a state-by-state comparison, Montana's treatment of the *Guides* is subject to rational-basis review.

6

deviation, loss, or loss of use of any body structure or function in an individual with a health condition, disorder, or disease." An "impairment rating" is a "consensus-derived estimate of loss of activity" reflecting the "severity of impairment for a given health condition, and the degre[]e of associated limitations in terms of Activities of Daily Living." A "whole person impairment" is a percentage that "estimate[s] the impact of the impairment on the individual's overall ability to perform Activities of Daily Living, excluding work." The whole person impairment rating ranges from normal (0%) to totally dependent on others for care (90+%) to approaching death (100%).

¶12 The Sixth Edition of the *Guides* introduced the use of standardized Impairment Classes in the determination of a patient's impairment rating. The *Guides* use these Classes, from zero to four, as part of an injury- or organ-specific impairment grid. The Classes are defined to represent loss of functionality. They "range from level 0 (no functional problem) to level 4 (complete problem with total functional loss)." Class 1 is used for persons with a "MILD problem," described as "[s]ymptoms with strenuous activity; no symptoms with normal activity (independent)." Class 2 is used for persons with a "MODERATE problem," described as "[s]ymptoms with normal activity (independent)." Classes 3 and 4, described as "SEVERE" and "COMPLETE," respectively, are reserved for persons who are either "partially dependent" or "totally dependent" and have progressively more severe symptoms.

¶13 The range of whole person impairment percentages assigned to each Class depends on the nature of the injury or condition; the *Guides* indicate that the ranges represent the effect of the particular injury on the person's overall functionality. Though the percentages

of impairment may vary depending on the disorder or condition, the generic template is consistent across all impairment classification grids. An impairment grid is a table a medical provider uses to calculate a patient's impairment rating. The grids are flexible and vary somewhat between different injuries or organ systems but follow a standardized template. Class 0 is always a 0% impairment percentage. In the Shoulder Regional Grid for Upper Extremity Impairments, a Class 1 impairment is associated with a possible whole person impairment from 1%-13%; Class 2 from 14%-25%; Class 3 from 26%-49%; and Class 4 from 50%-100%. The grids for other musculoskeletal systems use similar impairment percentages. But the grids for other organ systems may place a whole person impairment percentage in different groupings; for Metabolic Bone Disease, for example, Class 1 ranges from 1% to only 3% and Class 2 from 4% to 5%. The impairment grid includes a Severity Grade for each Class and a list of Impairment Criteria to be considered depending on the specific injury: History of Clinical Presentation, Physical Examination or Physical Findings, Clinical Studies or Objective Test Results, and sometimes Functional History and Burden of Treatment Compliance (BOTC).[3] The Impairment Criteria describe symptoms or clinical findings for each possible Impairment Class column. For each impairment grid, the *Guides* designate one Impairment Criterion as the "key factor"; that factor determines the Class within which the final impairment will fall. For most

---

[3] "The BOTC refers to the impairment that results from adhering to a complex regimen of medications, testing, and/or procedures to achieve an objective, measurable, clinical improvement that would not occur, or could potentially be reversed, in the absence of compliance." In the musculoskeletal assessments, the BOTC is not separately added because it "is already considered as part of the History of Clinical Presentation[.]"

conditions, including "musculoskeletal organ systems," the key factor is History of Clinical Presentation—the "pertinent history and case summary data at MMI that identify an anatomic region or diagnosis being considered, confirm history of illness or injury, and support the selection of the particular disease specific impairment grid[, including] [h]istorical indicators of severity and chronicity of the condition[.]"  This is used as the key factor because "it captures considerable information regarding an individual's prior clinical course that is relevant to the rating but which may not be apparent on the day of the examination."

¶14    The Generic Template for Impairment Classification Grids, which is the format the *Guides* adopt for a uniform process of assigning impairment, defines each impairment criterion to describe the patient's condition.  For Class 1, the descriptions are:

> History of Clinical Presentation: Symptoms controlled with continuous treatment *or* intermittent, mild symptoms despite continuous treatment
>
> Physical Examination Or Physical Findings: Physical findings not present with continuous treatment *or* intermittent, mild physical findings
>
> Clinical Studies Or Objective Test Results: Consistently normal with continuous treatment *or* intermittent mild abnormalities
>
> Functional History [which "is used as a grade modifier in the musculoskeletal chapters"]: Pain/symptoms with strenuous/vigorous activity; Able to perform self-care activities independently

¶15    A medical provider uses the impairment grid to determine an impairment percentage as follows.  First, the provider notes which Impairment Criterion is the key factor in whichever injury-specific impairment grid the provider is using.  She will then determine the claimant's overall Impairment Class by determining the description of symptoms or

9

findings in the key factor criterion with which the claimant presents. Next, the provider adjusts for other non-key Impairment Criteria that may be present. If these criteria fall into the same Class as the key factor, the overall impairment percentage is assigned the middle Severity Grade for that Class. If the other criteria fall into a higher or lower Class, however, the Severity Grade will be modified accordingly.[4] The resulting percentage is the patient's impairment rating.[5]

¶16 The result of this system is that a claimant with an overall whole person impairment percentage may, depending on her specific injury and individual medical factors, fall into Class 1, while another claimant with the same whole person percentage, yet a different injury, may fall into Class 2 or higher. Hensley thus claims that § 39-71-703(2), MCA, violates equal protection because a claimant with the same four percent whole person impairment percentage may fall into Class 2 and therefore receive an impairment award, while she is denied one despite suffering the identical whole person impairment percentage.

¶17 Hensley brings a facial challenge against the statute. She maintains that as applied to her, the "facial challenge encompasses her claim. If the Court agrees § 703(2) is facially unconstitutional for all similarly situated claimants, it would include Hensley." Hensley thus bears the heavy burden to show "that 'no set of circumstances exists' under which the

---

[4] If the Severity Grade adjustment results in the impairment rating moving into a higher or lower Class than originally assigned under the key factor, the *Guides* instruct the provider to stop at the highest or lowest Severity Grade in the Class as determined by the key factor. The *Guides* caution that should non-key Impairment Criteria be several Impairment Classes higher than the key factor, the examiner "might want to be certain that the non-key factors were, indeed, correct."

[5] Some impairment grids automatically provide a whole person impairment rating rather than just an impairment rating; the *Guides* additionally contains charts allowing a provider to combine impairment ratings for multiple injuries into a final whole person impairment rating.

statute would be valid or that the statute lacks any 'plainly legitimate sweep.'" *In re S.M.*, 2017 MT 244, ¶ 10, 389 Mont. 28, 403 P.3d 324 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008)); *see also Robinson v. State Comp. Mut. Ins. Fund*, 2018 MT 259, ¶ 17 n.1, 393 Mont. 178, 430 P.3d 69 (observing that the challenger "must show . . . that the law is unconstitutional in all of its applications") (quoting *Mont. Cannabis Indus. Ass'n. v. State*, 2016 MT 44, ¶ 14, 382 Mont. 256, 368 P.3d 1131 ("*MCIA II*")); *In re Marriage of K.E.V.*, 267 Mont. 323, 336, 883 P.2d 1246, 1255 (1994) (Trieweiler, J., concurring and dissenting) (noting that "a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.") (citation and internal quotation marks omitted).

*Equal Protection Analysis*

¶18    The Fourteenth Amendment to the United States Constitution and Article II, Section 4 of the Montana Constitution guarantee equal protection of the law to every person. *Powell*, ¶ 16. The principal purpose of the Equal Protection Clause is "to ensure that Montana's citizens are not subject to arbitrary and discriminatory state action." *MCIA II*, ¶ 15 (citing *Powell*, ¶ 16). Equal protection thus guarantees that persons similarly situated with respect to a legitimate government purpose of a law receive like treatment. *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192 ("*Rausch II*"). "However, the equal protection clause does not preclude different treatment of different groups so long as all individuals within the group are treated the same." *Rausch II*, ¶ 18 (citing *Powell*, ¶ 22). This Court evaluates potential equal protection

11

violations under a three-step process. *Satterlee*, ¶ 15. First, the Court identifies the classes involved and determines if they are similarly situated. *Satterlee*, ¶ 15. Second, the Court determines the appropriate level of scrutiny to apply to the challenged statute. *Satterlee*, ¶ 17. Finally, the Court applies the appropriate level of scrutiny to the statute. *Satterlee*, ¶ 18.

*Defining the Classes*

¶19    We identify similarly situated classes by isolating the factor allegedly subject to impermissible discrimination; if two groups are identical in all other respects, they are similarly situated. *Goble*, ¶ 29 (citing *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 27, 325 Mont. 148, 104 P.3d 445; *Oberson v. U.S. Dept. of Agric.*, 2007 MT 293, ¶¶ 19-20, 339 Mont. 519, 171 P.3d 715). Hensley has a four percent whole person Class 1 impairment and, because she returned to work at the same pay-rate as before her injury, has no actual wage loss and is not eligible for an impairment award. Claimants with a Class 2 (or 3 or 4) impairment and no wage loss, however, are eligible for an impairment award regardless of their whole person impairment percentage. Hensley contends that a claimant's Class 1 impairment is the sole factor differentiating her from otherwise similarly situated claimants. MSF argues that Hensley has mischaracterized the classes at issue— that the heart of Hensley's argument is that injured workers should receive PPD benefits in all circumstances, and therefore the classes are properly stated as Class 1 claimants without wage loss and Class 1 claimants with wage loss.

¶20    We do not agree with MSF's characterization of the classes. A worker with actual wage loss and a whole person impairment rating greater than zero percent, be it designated

12

Class 1 or Class 2, is entitled to full PPD benefits pursuant to § 39-71-703(1), MCA. Relying on *Wilkes v. Mont. State Fund*, 2008 MT 29, ¶ 6, 341 Mont. 292, 177 P.3d 483, MSF's characterization of the classes focuses on a worker's status as having or not having a PPD. Hensley does not contest that she does not have a PPD or how PPD claimants stand in respect to her own position; rather, she asserts that other claimants without a PPD, but with a whole person impairment, will receive an impairment award so long as their impairments are Class 2 or higher under the *Guides*. Hensley thus alleges discrimination on the basis of a non-wage-impacted claimant's Impairment Class rating. This distinguishes *Wilkes*, which involved denial of *PPD benefits* to certain claimants without wage loss. We agree with the WCC that the two classes here are best described as (1) claimants with a Class 1 impairment, without wage loss; and (2) claimants with a Class 2, 3, or 4 impairment, without wage loss.[6]

*Similarly Situated*

¶21     Next, the Court must determine if the two classes are similarly situated by isolating the factor subject to the allegedly impermissible discrimination (here a claimant's Class 1 rating as opposed to a higher Impairment Class rating). If the two groups are equivalent in all respects other than the isolated factor, then they are similarly situated. *See Goble*, ¶ 29; *Rausch II*, ¶ 18. The WCC concluded that, "based upon [the *Guides*], claimants with Class 1 impairments are not similarly situated to claimants with Class 2, 3, and 4

---

[6] We recognize that it is unlikely a Class 3 or 4 claimant will suffer no actual wage loss, but for purposes of equal protection classification, the three Classes (2 and higher) belong together.

impairments." We disagree. "[W]hether [a] challenged statute creates a discriminatory classification is informed by the statute's purpose." *MCIA II*, ¶ 17 (citing *Caldwell v. MACo Workers' Comp. Tr.*, 2011 MT 162, ¶ 19, 361 Mont. 140, 256 P.3d 923). When the single distinguishing factor between the two classes constitutes a "fundamental distinction" relative to the underlying purpose of the statute, the classes are not similarly situated. *See MCIA II*, ¶¶ 17-18 (concluding that distinctions in the regulation of different narcotics, specifically the use of federally prohibited marijuana, results in a fundamental distinction plainly relating to the underlying justification of the statute sufficient to render the two classes dissimilar for equal protection purposes); *Wilkes*, ¶¶ 19-20 (holding that for the purposes of PPD benefits, whether a claimant has actual wage loss is a fundamental distinction plainly relating to the underlying justifications of § 39-71-703(1)(a), MCA, that "wage-loss benefit[s] should bear a reasonable relationship to actual wages lost as a result of work-related injury or disease"). Evident from its plain language, the purpose of § 39-71-703(2), MCA, is to provide an impairment award to a claimant with no actual wage loss who nevertheless suffers "the loss of physical function of his or her body." *Rausch v. State Comp. Ins. Fund*, 2002 MT 203, ¶ 21, 311 Mont. 210, 54 P.3d 25 ("*Rausch I*").

¶22 Unlike the actual wage loss distinction in *Wilkes*, there is no fundamental distinction between Class 1 and Class 2 claimants relative to the purpose of § 39-71-703(2), MCA. Isolating the allegedly discriminatory factor here, a claimant's Impairment Class, leaves all potential claimants without wage loss similarly situated under § 39-71-703(2), MCA. Both classes of claimants have a whole person impairment percentage greater than zero—

14

and possibly even the same percentage—representing at least a nominal degree of loss of physical function. Both classes of claimants have suffered some measurable loss of functionality, and neither has endured a loss of wages as defined by the statute. It is only when the isolated factor, Impairment Class, is added that the classes receive dissimilar treatment—claimants with a Class 2 or greater impairment may recover an impairment award, but claimants with a Class 1 impairment may not. Claimants with a Class 1 impairment and no wage loss and claimants with a Class 2 or higher impairment with no wage loss thus are similarly situated for equal protection purposes.

*Rational Basis Scrutiny*

¶23 Having defined the relevant classes and determined that they are similarly situated, we turn to a facial examination of the statute under the appropriate level of scrutiny. This Court has long held that rational basis review applies to workers' compensation statutes, and no party suggests otherwise. *See Goble*, ¶ 35; *Satterlee*, ¶ 17; *Rausch II*, ¶ 18; *Powell*, ¶ 21. "The rational basis test requires that (1) the statute's objective was legitimate, and (2) [] the statute's objective bears a rational relationship to the classification used by the legislature." *Satterlee*, ¶ 18. We defer to the Legislature's policy choices; in doing so, we recognize that cost control may be considered in conjunction with other legitimate interests but cannot alone justify disparate treatment of similar classes. *See Satterlee*, ¶ 29 ("As long as cost containment is not the sole reason for disparate treatment and it is achieved by a rational means the legislature may attempt to improve the viability of the workers' compensation system without offending the Equal Protection Clause"); *see also Powell*, ¶ 30; *Caldwell*, ¶ 34. Because the rational basis test requires that a statute rationally

15

relate to a legitimate government interest, we take into account the public policy considerations underlying Montana's workers' compensation system in coming to a conclusion. *Goble*, ¶ 36; *see also Reesor v. Mont. State Fund*, 2004 MT 370, ¶ 16, 325 Mont. 1, 103 P.3d 1019; *Henry*, ¶¶ 34-35.

*Legitimate Statutory Objective*

¶24   Hensley argues that § 39-71-703(2), MCA, fails rational basis review because the Legislature's sole objective in amending the statute in 2011 was cost containment. She argues that there is no legitimate objective to be served in "tak[ing] benefits from less injured people and giv[ing] them to more injured people."

¶25   MSF counters that the Legislature sought to strengthen the workers' compensation system as a whole and to increase certain benefits—including those found in § 39-71-703(2), MCA—pursuant to the system's goals. MSF argues that the Legislature's decision to strengthen benefits to workers who suffer PPD demonstrates that its objective in amending § 39-71-703, MCA, was not solely cost containment.

¶26   The statutory amendment that limited eligibility for an impairment award to those with a Class 2 or greater impairment was included in a bill containing many other substantive changes to the workers' compensation system. The fiscal note attached to HB 334 contemplated overall cost savings but revealed numerous changes that would increase costs and benefits within the system. Among those changes, the bill added twenty-five weeks to the PPD award computation found in § 39-71-703(3)-(5), MCA, estimated to cost $3,500,000. This computation is used not only in computing the benefits to which PPD

16

claimants are entitled under § 39-71-703(1), MCA, but also in computing the impairment award claimants receive under § 39-71-703(2), MCA.[7]

¶27 The change reflects the Legislature's prerogative to determine how best to fulfill the public policy objectives behind the workers' compensation system. Those objectives are set forth in § 39-71-105, MCA (2011). One is to provide no-fault "wage-loss and medical benefits to a worker suffering from a work-related injury or disease." Section 39-71-105(1), MCA (2011).[8] Another "is to return a worker to work as soon as possible after the worker has suffered a work-related injury or disease." Section 39-71-105(3), MCA (2011). Adding an additional twenty-five weeks to the calculation used in determining PPD awards accomplishes both goals.

¶28 "'[T]he power of the legislature to fix the amounts, time and manner of payment of workers' compensation benefits is not doubted.'" *Walters v. Flathead Concrete Prods.*, 2011 MT 45, ¶ 29, 359 Mont. 346, 249 P.3d 913 (quoting *Satterlee*, ¶ 34). "To a certain extent, nearly all legislation sets forth classifications regarding applicability, benefits and recipients; the fact that some of these classifications are imperfect does not necessarily mandate a conclusion that they violate the equal protection clause." *Gulbrandson v. Carey*, 272 Mont. 494, 503, 901 P.2d 573, 579 (1995) (citation omitted). We summarized in *Walters* the numerous legitimate governmental concerns underlying the WCA. Among

---

[7] Consistent with the amendment, Hensley used the 400-week figure, rather than the pre-amendment 375-week figure, in computing her theoretical impairment award.

[8] Hensley received all such benefits from the time of her injury until she was released to return to work at full pay.

17

those, "[w]e have identified improving the financial viability of the system, controlling costs of the system, and providing benefits as 'legitimate governmental objective[s].'" *Walters*, ¶ 28 (quoting *Stratemeyer v. Lincoln Co.*, 259 Mont. 147, 155, 855 P.2d 506, 511 (1993) ("*Stratemeyer I*")). We noted "that the quid pro quo itself serves legitimate purposes, providing 'no fault recovery' for workers and 'predictability of consistent workers['] compensation payments' for the employer." *Walters*, ¶ 28 (quoting *Satterlee*, ¶ 39).

¶29 The Workers' Compensation Act contains no explicit public policy to provide impairment awards to claimants without wage loss. But MSF does not disagree that § 39-71-703(2), MCA, advances a legitimate objective in compensating workers who experience a loss of physical function of some part of their body, whether or not they have sustained any actual wage loss. *See generally Rausch I*, ¶ 21 ("An impairment award is paid to compensate the worker for the loss of physical function of his or her body, which may have ramifications beyond just the worker's ability to return to work."). We agree that providing impairment-only awards to those workers functionally impacted by an injury, despite their ability to continue working at the same or higher pay, serves a legitimate objective. Having chosen to provide such awards, the Legislature may not condition them on arbitrary classifications. But the Legislature legitimately may choose a classification system that provides consistency and uniformity in functional assessment, ensuring that people with similar functional limitations are given like classifications. And by the *Guides*' definition—unaltered from the previous edition—"impairment" is a "significant" deviation or loss; the purpose of the impairment assessment is to determine

18

whether a particular claimant has sustained such a loss and should be compensated. In *Satterlee*, ¶ 30, we found a legitimate government interest in providing Permanent Total Disability benefits that bear a reasonable relationship to actual wages lost. In the context of impairment-only awards, the government has a legitimate interest in providing benefits that bear a reasonable relationship to the actual functional loss a worker sustains. Considering the purpose of an impairment award within the overall scheme of the workers' compensation system, the objective is legitimate.

*Rational Relationship to the Statute's Objective*

¶30     That leads to the final inquiry: whether a legitimate governmental objective bears some identifiable rational relationship to the statutory classification. *Satterlee*, ¶ 18; *Powell*, ¶ 21. Hensley does not dispute the *Guides'* use of Impairment Class in determining an injured worker's impairment rating but argues that the Legislature "misappropriated" the Impairment Class as a means to differentiate between claimants in § 39-71-703(2), MCA. Hensley argues that, because the purpose of an impairment award is to compensate a claimant for permanent loss of functionality and not for wage loss, precluding such compensation based only on Impairment Class does not account for the whole-person impairment rating and therefore is arbitrary and irrational.

¶31     Agreeing with this premise, Justice Gustafson's Dissent relies on *Caldwell* for the proposition that the Legislature cannot eliminate benefits from one class of workers to increase benefits for another class. Dissent, ¶ 85. But there are two problems with this characterization. First, it is too simplistic. As both Hensley and the Dissent acknowledge, the Equal Protection Clause allows the Legislature to treat similarly situated individuals

19

differently, provided it has a rational, as opposed to an arbitrary, reason for doing so. *See Goble*, ¶ 37 (finding rational basis for termination of PPD benefits to incarcerated claimants); *see also Henry*, ¶ 40 (noting that "offering services to some while excluding others for any *arbitrary* reason" is impermissible though it "will **always** result in lower costs") (quoting *Heisler v. Hines Motor Co.*, 282 Mont. 270, 283, 937 P.2d 45, 52 (1997)) (first emphasis added); *Stratemeyer I,* 259 Mont. at 154, 855 P.2d at 511 (holding that excluding workers' compensation for mental or stress claims occurring without a physical component rationally relates to the legitimate governmental objective of controlling the costs of the workers' compensation program in order to continue providing benefits).

¶32 In *Caldwell*, we held the challenged dissimilar treatment unlawful where termination of rehabilitation benefits had no relationship to a worker's injury or prospects for returning to work but was based exclusively on age—an arbitrary classification because age had nothing to do with a worker's actual ability to return to work. Here, in contrast, the dissimilar treatment is based on the difference in a worker's functional limitation. A worker's functional limitation—the very basis of determining whether she is "impaired" and thus entitled to an award—is based on the medical evidence, as interpreted by a medical provider, once a claimant reaches MMI, not by the mere passage of time as in *Caldwell*. Rather than an arbitrary choice unmoored from the purpose of the benefit, the Class designation represents a method by which the *Guides* seek to quantify a person's functional assessment, grouping persons with similar overall limitations—or lack thereof—into similar Classes.

20

¶33     The second problem with Hensley's and the Dissent's characterization is that the *Guides'* adoption of a uniform system of Classes, and the Legislature's reliance on that classification system, does not "take benefits" from a class of workers to give them to another.   The Sixth Edition emphasizes the need for consistency, noting that previous versions of the *Guides* had considerable variation in the number of impairment classes depending on a person's specific disorder or injury.[9]   The authors explained that that "[c]riticism of previous editions of the *Guides* includes lack of validity due, in part, to inadequate attention to functional assessment."

¶34     The Sixth Edition of the *Guides* thus categorizes whole person impairments into one of five classes based on the severity of the person's loss of function for the condition at issue.   The *Guides'* stated goal for the classification system is to "yield maximal internal consistency of impairment ratings across organ systems."   To determine a claimant's whole person impairment, the claimant's medical provider applies the *Guides'* criteria "to translate human pathology resulting from a trauma or disease process into a percentage of the whole person."   The findings and symptoms found within each impairment grid vary based on the injury the provider is assessing, and the classification takes into account its impact on the patient.

---

[9] The Sixth Edition authors observed that prior versions had "a wider range and variation in impairment percentages within organ systems."   The Sixth Edition's design was to improve consistency in the classification range for different disorders or "organ systems."

21

¶35    The *Guides* contain demonstrative examples of examination results and corresponding impairment ratings for various body parts, organ systems, and types of diseases.  Impairment Class is referenced in these examples as an expression of the final impairment percentage rating.  For example, a hypothetical hyperparathydroidism analysis concludes with: "Impairment Rating: Class 1, 2% [whole person impairment]"; likewise, a healed compound bone fracture analysis ends with: "Impairment Rating: 8% impairment of the whole person.  This individual is in [C]lass 2 . . . ."  Clearly, rather than being merely an organizational system as Hensley argues, the *Guides* designed the Impairment Class to provide a more uniform process for assigning impairment based on the claimant's specific condition.

¶36    Neither an impairment percentage nor a classification of different percentages into groupings provides a perfect system of assessing functional disability.  The *Guides* acknowledge these imperfections, pointing out that assessment of impairment is an inexact science:

> The relationship between impairment and disability remains both complex and difficult, if not impossible, to predict.  In some conditions there is a strong association between level of injury and the degree of functional loss expected in one's personal sphere of activity (mobility and ADLs).  The same level of injury is in no way predictive of an affected individual's ability to participate in major life functions (including work) when appropriate motivation, technology, and sufficient accommodations are available.  Disability may be influenced by physical, psychological, and psychosocial factors that can change over time.

The *Guides* recognize that impairment and disability "are complex concepts that are not yet amenable to evidence-based definition."  Although they note that the *diagnosis* should be evidence-based, "the impact of injury or illness is dependent on factors beyond physical

22

and psychological aspects, including psychosocial, behavioral and contextual issues. Therefore, it is more challenging to obtain data needed to define an evidence-based approach to impairment assessment." The Sixth Edition set out to improve the consistency of the *Guides'* functional assessment methodology in an attempt, albeit still less than precise, to explain the level of a person's disability.

¶37 In sum, both the impairment percentage and Class designation are based on objective medical findings, as the WCA requires, but neither provides an air-tight formula for expressing a person's level of functional impact from an injury or condition. The right to an impairment award not being fundamental, the Legislature may define its contours, provided the distinction is not arbitrary. *See Powell*, ¶ 21; *Satterlee*, ¶¶ 27-28. The Dissents mistakenly equate medical impairment classification with classification under the law for equal protection purposes. To qualify a worker to receive compensation for permanent partial disability, the Legislature chose to use—along with wage loss—the *Guides'* permanent impairment rating, which reflects the whole person impairment percentage. *See* §§ 39-71-703(1)(b), (requiring permanent impairment rating more than zero), 39-71-711(1)(c), MCA (requiring that an "impairment rating . . . be expressed as a percentage of the whole person"). But where a worker does not have a permanent partial disability, the Legislature has adopted the *Guides'* Class designation to determine eligibility for an impairment award. It needed only a rational basis for doing so. And it had one, determining to allow such an award only when a worker's injury—as determined by the *Guides*—affects her ability to engage in "normal activity" without symptoms.

23

¶38 "Impairment" being tied to some "significant" loss or deviation, the Legislature reasonably could choose the *Guides'* new template format for categorizing that level of severity. "[I]t may be 'easy to opine that the Legislature could have done better'" in setting parameters for functional impairment determinations; "the law, however, 'requires us to recognize that such a debate involves issues and decisions about public policy that are clearly of the sort much better suited to the halls of the legislature.'" *MCIA II*, ¶ 27 (quoting *Walters*, ¶ 33). In constitutional analysis, particularly under rational basis scrutiny, "[o]ur role is not to second guess the prudence of a legislative decision." *Satterlee*, ¶ 34.

¶39 For the statute to fail on a facial challenge, we would have to conclude that the Legislature must award an impairment benefit to any worker with the slightest impact from a work-related injury. But as the *Guides* acknowledge, disability "may be influenced by physical, psychological, and psychosocial factors" not measured by clinical evaluation alone, and an impairment rating is not a scientifically precise measure of a person's functional assessment. Applying appropriate deference to the legislative choice of policy alternatives, we conclude that the distinction between Class 1 claimants without wage loss and Class 2 or higher claimants without wage loss bears a rational relationship to the objectives of § 39-71-703(2), MCA. The WCC properly recognized that it is not arbitrary to limit impairment awards to those whose symptoms and functional limitations impact normal activities; such a distinction is consistent with the definition of "impairment." That the precise impairment percentages falling under Class 1 may vary between different workers and different injuries is simply a function of the Sixth Edition's design to focus on

24

uniformity of functional assessment. Some conditions yield more functionality than others; both the whole person impairment percentage and the Class designation account for this variability. "[R]ational distinctions may be made with substantially less than mathematical exactitude." *Ward v. Johnson*, 2012 MT 96, ¶ 23, 365 Mont. 19, 277 P.3d 1216 (citation omitted). Hensley cannot demonstrate that the statute is unconstitutional in all of its applications.[10]

¶40　　In adopting a standardized Impairment Class system, the *Guides'* authors sought to maximize the "internal consistency of impairment ratings across organ systems." The Legislature rationally could decide that claimants with a Class 2 or higher impairment rating are more likely to have sustained the loss of functionality that impairment awards are meant to compensate. That is a decision within its discretion.

**CONCLUSION**

¶41　　We indulge "every possible presumption . . . in favor of the constitutionality of a challenged statute." *Gulbrandson*, 272 Mont. at 503, 901 P.2d at 579. We agree with the WCC that § 39-71-703(2), MCA, passes rational-basis muster under the Equal Protection Clause of the Montana Constitution. Though the classes at issue are similarly situated, we conclude that Hensley has not met her burden of demonstrating that the statutory differentiation between them violates the constitution. For the purposes of eligibility for the impairment award found in § 39-71-703(2), MCA, the Legislature had a rational basis

---

[10] A worker whose injury and whole person impairment percentage result in a Class 1 impairment could bring an as-applied challenge if the worker claims to have suffered a significant functional impact or injuries to multiple organ systems not accounted for in the Class designation, but Hensley makes no such claim in this case.

25

for distinguishing between Class 1 and Class 2 or higher claimants without actual wage loss. The WCC's judgment is therefore affirmed.


/S/ BETH BAKER


We Concur:

/S/ MIKE McGRATH
/S/ JIM RICE


Justice James Jeremiah Shea, specially concurring.

¶42 In his dissent, Justice Sandefur provides a compelling analysis of the facial constitutionality of § 39-71-703(2), MCA, when considered within the framework of the quid pro quo structure that provides the bedrock of our workers' compensation system. However, this argument was not presented to either the Workers' Compensation Court or to this Court on appeal. The Court's Opinion correctly notes that Hensley does not make a discrete claim that § 39-71-703(2), MCA, undermines the quid pro quo. Opinion, ¶ 5, n 1. More to the point in my consideration, though, Hensley does not argue the implications of the quid pro quo in her equal protection challenge. The only one to make that argument in this case is Justice Sandefur. Compelling as the argument may be, it would be fundamentally unfair to both the parties and the Workers' Compensation Court to decide the constitutionality of a statute based on an argument that was never made. It is well established that we do not consider new arguments or legal theories for the first time on appeal because it is fundamentally unfair to the parties. *Pilgeram v. GreenPoint Mortg.*

*Funding, Inc.*, 2013 MT 354, ¶¶ 20-21, 373 Mont. 1, 313 P.3d 839. It also is unfair to fault the trial court on an issue that it was never given an opportunity to consider. *State v. Montgomery*, 2010 MT 193, ¶ 11, 357 Mont. 348, 239 P.3d 929.

¶43 Considering only the arguments as they were presented to the Workers Compensation Court and to this Court, I agree with the Court's ultimate conclusion that, in this particular case, Hensley has not met her burden of demonstrating that § 39-71-703(2), MCA, violates equal protection. I therefore concur in the result affirming the WCC.

/S/ JAMES JEREMIAH SHEA

Justice Ingrid Gustafson, dissenting.

¶44 Susan Hensley (Hensley) appeals from the Workers' Compensation Court's Order Granting Respondent's Motion for Summary Judgment and Denying Petitioner's Motion for Summary Judgment in which the WCC ruled that Hensley had failed to prove that § 39-71-703(2), MCA (2011), violated her constitutional right to equal protection. I agree with the Plurality that the WCC correctly identified the classes but erred in concluding the identified classes were not similarly situated. I disagree with the Plurality's determination that § 39-71-703(2), MCA, survives this equal protection challenge because I would hold that no legitimate governmental objective to deny impairment awards to the identified class has been identified. While the Plurality identifies reallocation as a legitimate governmental objective, it does not explain how this objective is legitimate in this instance when this Court flatly rejected this approach in *Caldwell v. MACo Workers' Comp. Trust*, 2011 MT

27

162, ¶¶ 38-47, 361 Mont. 140, 256 P.3d 923, and it conflates the identification of a legitimate governmental objective with the analysis of whether the identified legitimate governmental objective bears a rational relationship to the classification used by the Legislature. Because I conclude § 39-71-703(2), MCA, does not fulfill a legitimate governmental objective and violates Hensley's constitutional right to equal protection, I would also conclude it is unnecessary to consider whether the classification used by the Legislature bears a rational relationship to the statute's objective and I address this issue only in response to the Plurality's faulty conclusion in this regard. I would reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

¶45 The facts underlying Hensley's claim are undisputed. In January 2012, Hensley suffered an industrial injury to her shoulder while in the course and scope of her employment as a paramedic. Because the industrial injury occurred while the 2011 version of the Workers' Compensation Act (WCA) was in effect, the 2011 statutes govern this matter. *Buckman v. Mont. Deaconess Hosp.*, 224 Mont. 318, 322, 730 P.2d 380, 382 (1986).

¶46 Montana State Fund (MSF) insured Hensley's employer at the time of her injury. MSF accepted liability after Hensley made a workers' compensation claim.

¶47 Hensley underwent surgery to repair her shoulder. However, she continued to experience symptoms post-surgery, including tingling and numbness in her arm. In spite of ongoing symptoms, Hensley was able to return to her time-of-injury job as a paramedic

28

without any formal restrictions in May 2013—about sixteen months after her industrial injury.

¶48 A month after Hensley returned to work, her treating physician opined that she had reached maximum medical improvement (MMI), also referred to as medical stability, for her industrial injury. Pursuant to § 39-71-703(1)(b), MCA (2011), Hensley's doctor used the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (6th ed. 2008) (the "*Guides*"), to calculate Hensley's permanent impairment. He assigned Hensley a 4% whole person impairment rating. In addition to providing evaluators with a formula for calculating a person's impairment rating, the 6th edition of the *Guides* universally incorporated a categorization system, called "Class," that range from Class 0 to 4 from least to most severe. Under this system, a Class 0 designation means a person has no ratable impairment; designations of Class 1 to Class 4 are intended to indicate increasing levels of impairment. Hensley's injury was categorized as Class 1.

¶49 Because Hensley returned to her time-of-injury employer and suffered no wage loss, and because her permanent impairment was categorized as a Class 1 impairment, MSF did not pay Hensley an impairment award; § 39-71-703(2), MCA (2011), excludes injured workers with Class 1 impairments and no actual wage loss from entitlement to an impairment award. The value of Hensley's impairment rating, if her impairment award was payable, is $5,192.

¶50 Hensley challenged MSF's denial of her impairment award in the WCC, arguing in part that § 39-71-703(2), MCA (2011), denies equal protection to injured workers with Class 1 impairments and no actual wage loss. Both Hensley and MSF moved for summary

29

judgment. The WCC ruled in MSF's favor, concluding that Hensley's equal protection challenge failed because the classes were not similarly situated. This appeal followed.

**DISCUSSION**

¶51 *Does § 39-71-703(2), MCA (2011), violate the constitutional right to equal protection by denying impairment awards to injured workers who do not experience a wage loss as a result of their injury and who are assigned a Class 1 impairment rating?*

**I. History of Impairment Awards in Montana Workers' Compensation Law**

¶52 Payment of impairment awards to all injured workers left with a permanent loss of physical function after reaching MMI, and usage of the *Guides* to determine impairment ratings, developed over time in Montana's workers' compensation scheme. Montana was among the first states to adopt laws providing for workers' compensation, and the Legislature adopted the "essential framework" for the WCA in 1915. *Wight v. Hughes Livestock Co.*, 204 Mont. 98, 106, 664 P.2d 303, 307-08 (1983). The workers' compensation system began as an outgrowth of tort law: Workers forfeited their right to sue their employers in exchange for a no-fault, speedy system of guaranteed compensation. *Henry v. State Comp. Ins. Fund*, 1999 MT 126, ¶ 12, 294 Mont. 449, 982 P.2d 456. This "grand bargain" bars injured workers from seeking the possibility of larger awards potentially available through the tort system in exchange for more certainty of an award. *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 56, 353 Mont. 265, 222 P.3d 566

(Morris, J., dissenting) (citing *Sitzman v. Shumaker*, 221 Mont. 304, 307-08, 718 P.2d 657, 659 (1986)).[1]

¶53　The WCA has gone through many legislative reforms. A significant reform in 1987 provided for injured workers to obtain an impairment award, among other substantial revisions. Section 39-71-703, MCA (1987) ("The benefits available for permanent partial disability are impairment awards and wage supplements."). Prior to that time, injured workers who suffered permanent partial disability (PPD) received benefits only for actual wage loss, for up to 500 weeks. The creation of a separate impairment award, unrelated to wage loss, was further supported by § 39-71-116(14), MCA (1987), which in relevant part defined PPD as a condition, after a worker reached MMI, in which the worker has a medically determined physical restriction as a result of an injury and is able to return to work but suffers "impairment *or* partial wage loss, *or* both." (Emphasis added.)

¶54　Concomitant with the creation of the impairment award, the Legislature repealed §§ 39-71-705, -706, and -707, MCA, which had provided "disfigurement awards" for specific losses or partial losses, such as loss of a hand, hearing, or vision. These losses would instead be compensated, along with other permanent losses of function, under the new impairment award scheme. In order to determine the value of the newly created

---

[1] *Henry*, ¶ 12, states: "Historically, the workers' compensation system was an outgrowth of tort law. It was premised on a compromise whereby workers gave up their right to sue employers in tort for work-related injuries in exchange for a guaranteed compensation system. The injured worker gave up his right to receive full compensation for his injury in exchange for receiving a speedy and certain award; compensation did not depend upon the fault of the employer, nor was it denied based upon the fault of the employee. Based upon the legal environment existing at the time that workers' compensation laws were first enacted, this bargain was perceived as fair."

impairment awards, the Legislature enacted § 39-71-711, MCA (1987), which provided in part:

(1) An impairment rating:

(a) is a purely medical determination and must be determined by an impairment evaluator after a claimant has reached maximum healing;

(b) must be based on the current edition of the Guides to Evaluation of Permanent Impairment published by the American Medical Association; and

(c) must be expressed as a percentage of the whole person.

Since its enactment, every version of § 39-71-711(1), MCA, has required that impairment ratings be expressed as a percentage of the whole person. The whole person percentage is a crucial determination, as this is the numerical value used for calculating impairment awards. Once the impairment rating provides the percentage, the award is determined by inputting the whole person percentage into the award calculation formula found in § 39-71-703, MCA.

¶55 Through its various revisions, the WCA has implicitly recognized the existence of impairment awards as a distinct benefit. As this Court stated in *Rausch v. State Comp. Ins. Fund*, 2002 MT 203, ¶ 20, 311 Mont. 210, 54 P.3d 25 (*Rausch I*), "No section of the Workers' Compensation Act explicitly authorizes impairment awards per se. However, impairment awards are impliedly authorized to any injured worker classified in one of the four distinct classes of disability benefits by two sections of the Act, § 39-71-710, MCA, and § 39-71-737, MCA." Section 39-71-710(2), MCA (1987-2019), provides in part, "If a claimant who is eligible . . . to receive retirement benefits . . . suffers a work-related injury, the insurer retains liability for . . . any impairment award[.]" Section 39-71-737,

32

MCA (1987-2019), provides, compensation must run consecutively and not concurrently, and payment may not be made for two classes of disability over the same period, "*except that impairment awards* and auxiliary rehabilitation benefits *may be paid concurrently with other classes of benefits*." (Emphasis added.)

¶56 From 1987 forward, it was a rare Legislature that left § 39-71-703, MCA, untouched.[2] While the 1987 and 1989 versions of the WCA expressly classified impairment awards as a partial disability benefit, the 1991 and subsequent versions no longer provided authority for limiting impairment awards only to partially disabled claimants. *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 12, 327 Mont. 272, 114 P.3d 192 (*Rausch II*). Among other revisions, the 1991 amendments reduced the benefit calculation from 500 weeks to 350 weeks. Section 39-71-703(2), MCA (1991). Beginning in 1995, the statute explicitly provided that a worker with no actual wage loss as a result of the injury was eligible for an impairment award only.

¶57 Case law has further explained the nature of the impairment award and its role in compensating an injured worker. The impairment award does not replace lost wages. *Caldwell*, ¶ 38. In *Rausch I*, ¶¶ 39, 41, MSF[3] argued that an impairment award is neither

---

[2] The history of § 39-71-703, MCA, through the current (2019) version, provides as follows: En. 92-703.1 by Sec. 1, Ch. 155, L. 1973; amd. Sec. 1, Ch. 241, L. 1975; amd. Sec. 1, Ch. 278, L. 1975; R.C.M. 1947, 92-703.1; amd. Sec. 23, Ch. 464, L. 1987; amd. Sec. 64, Ch. 613, L. 1989; amd. Sec. 6, Ch. 9, Sp. L. June 1989; amd. Sec. 4, Ch. 574, L. 1991; amd. Sec. 13, Ch. 243, L. 1995; amd. Sec. 182, Ch. 42, L. 1997; amd. Sec. 12, Ch. 276, L. 1997; amd. Sec. 4, Ch. 464, L. 2003; amd. Sec. 8, Ch. 103, L. 2005; amd. Sec. 1, Ch. 36, L. 2011; amd. Sec. 9, Ch. 167, L. 2011; amd. Sec. 17, Ch. 55, L. 2015.

[3] Under its then-moniker State Compensation Insurance Fund.

a permanent partial nor permanent total disability benefit, but rather is a unique, distinct benefit intended only to compensate claimants for the medical component of their disability. As this Court stated in *Rausch I*, ¶ 21:

> Impairment awards are based on a worker's impairment rating, which is a purely medical determination of the loss of physical function of the body caused by the injury. § 39-71-711, MCA [ ]. The impairment rating is the physical component on which the disability is based. Disability benefits compensate the worker for losses related to their inability to work. An impairment award is paid to compensate the worker for the loss of physical function of his or her body, which may have ramifications beyond just the worker's ability to return to work. The difference is subtle, yet important. The inclusion of continued impairment award liability in § 39-71-710, MCA [ ], indicates the distinct nature of the impairment award from other types of disability benefits.

¶58     This Court has held that, while impairment awards are provided for in § 39-71-703, MCA, which is the statute that also provides for PPD benefits, an impairment award is not "linked to" partial disability as workers who do not incur an actual wage loss as a result of their work-related injuries do not fall within the definition of PPD but are nonetheless entitled to an impairment award. *Rausch I*, ¶¶ 26-27. An impairment award compensates an injured worker for the permanent loss of physical function and is designed to compensate an injured worker who is able to return to work. *Rausch II*, ¶ 23. Paying an impairment award to injured workers who are able to return to work is consistent with the WCA's stated purpose of returning injured workers to the workforce. *Rausch II*, ¶ 23. Thus, not only does an impairment award not replace lost wages, but it also bears no relationship to whether an injured worker incurs wage loss.

¶59     The present equal protection challenge focuses on the exclusion of certain workers from receiving an impairment award in spite of a physician's determination that each of

34

these workers has a ratable permanent impairment. Under § 39-71-703(2), MCA (2011-2019), some workers with a permanent loss of physical function receive their full impairment award, while other workers with the same impairment rating—the same percentage of permanent loss of physical function—receive nothing. This exclusion arose as part of H.B. 334, a package of WCA revisions passed by the 2011 Legislature.

¶60 Pertinent to the present case, the revisions included amending § 39-71-711(1)(b), MCA, to provide that impairment ratings must be based on the 6th edition of the *Guides*. Prior to 2011, the statute provided that impairment ratings be based upon the "current" edition and thus the *Guides* in use would automatically change whenever a new edition was published.

¶61 H.B. 334 also amended § 39-71-703, MCA, incorporating the use of impairment rating "Class," universally incorporated in the 6th edition of the *Guides*, and excluding injured workers who suffered no wage loss as a result of their work-related injuries and who were assigned impairment ratings the *Guides* categorized as Class 1 from obtaining impairment awards. Prior to the publication of the 6th edition of the *Guides*, "Class" did not exist in the same manner, and from the enactment of the 1987 WCA until the enactment of the 2011 WCA, all injured workers who were assigned impairment ratings received corresponding impairment awards as calculated by the formula within § 39-71-703, MCA.

¶62 The Plurality correctly notes that Montana is the only state to use the Class rating as the basis for an impairment-only award in workers' compensation matters, but it also asserts some other states have adopted the most recent version of the *Guides* without legislative review and that Class is used as a cutoff for silicosis litigation in some states

35

outside the workers' compensation context. Plurality, n2. Footnote 2, however, is misleading. First, although it is true that some states' comparable statutes adopt the most recent version of the *Guides* without legislative review, a Pennsylvania case found this practice to be an unconstitutional delegation of legislative authority. *Protz v. Workers' Comp. Appeal Bd.*, 161 A.3d 827 (Pa. 2017). One could anticipate a similar result if this provision was challenged in other states. Second, while it may be true that class is used as a cutoff for silicosis litigation outside of the workers' compensation arena, silicosis is a progressive occupational disease not unlike asbestosis; a claimant who is a Class 1 today will progress to a Class 2 in the future and their claim thus becomes ripe for litigation. Thus, this is incomparable to the present situation where the Class designation will not change over time, but rather serves as a permanent preclusion to benefits.

## II. Equal Protection Challenge

¶63    Both in the WCC and in this Court on appeal, Hensley argues that by denying impairment awards to injured workers such as herself—workers who were found to have a permanent impairment at MMI but who did not suffer a wage loss as a result of their work-related injuries—merely because the *Guides* designated the impairment as a Class 1 impairment, § 39-71-703(2), MCA, violates the right to equal protection guaranteed by Article II, Section 4, of the Montana Constitution.

¶64    When analyzing an equal protection claim, Montana's courts follow a three-step process:  (1) identify the classes involved and determine if they are similarly situated; (2) determine the appropriate level of scrutiny to apply to the challenged legislation; and (3) apply the appropriate level of scrutiny to the challenged statute. *Goble v. Mont. State*

*Fund*, 2014 MT 99, ¶ 28, 374 Mont. 453, 325 P.3d 1211.  In this case, the WCC concluded Hensley's equal protection challenge failed because the classes were not similarly situated, but further advised that it would also conclude a rational basis supports the statute.

*1(A).  How are the classes identified?*

¶65    Hensley asserts that the two similarly situated classes are: permanently physically impaired claimants with no wage loss and an impairment categorized as Class 1; and permanently physically impaired claimants with no wage loss and an impairment categorized as Class 2.  MSF argues that Hensley mis-identifies the classes and that the classes to be compared are permanently physically impaired claimants with a wage loss and an impairment categorized as Class 1; and permanently physically impaired claimants with no wage loss and an impairment categorized as Class 1.  MSF points to *Wilkes v. Mont. State Fund*, 2008 MT 29, 341 Mont. 292, 177 P.3d 483, which raised an equal protection challenge to § 39-71-703, MCA (2001), because the statute required that permanently partially disabled workers demonstrate they suffered an actual wage loss as a result of their injury.  However, as we explained in *Goble*, ¶ 32, in identifying the classes, we must isolate the "sole distinguishing factor" between the classes.  In *Wilkes*, the presence or absence of wage loss was the sole distinguishing factor between those who received permanent partial disability benefits and those who did not; here, the Class category is the sole distinguishing factor between those who receive an impairment award and those who do not.  Therefore, in agreement with the WCC, I reject MSF's invitation to define the classes by the absence or presence of wage loss.  Wage loss is irrelevant in this case and has no relationship to impairment rating: whether or not an injured worker has

37

wage loss does not depend upon the severity of the worker's permanent loss of function but rather on the worker's job duties and the employer's ability to accommodate the worker's needs.

¶66 However, MSF argued that if the WCC, and now this Court, rejects MSF's suggestion to define the classes by wage loss, the Court should define the classes as permanently physically impaired claimants with no wage loss and an impairment categorized as Class 1; and permanently physically impaired claimants with no wage loss and an impairment categorized as Class 2, 3, or 4. MSF argued, and the WCC agreed, that this was a more suitable definition of the classes, as this would encompass all claimants with a ratable permanent impairment and no actual wage loss.

¶67 I accept the WCC's class definition. This identification of classes is consistent with our identification of classes in comparable equal protection challenges. For example, in *Henry*, which raised an equal protection challenge to the statutory provisions which mandated that workers suffering from industrial injuries could receive vocational rehabilitation benefits while workers suffering from occupational diseases could not, this Court identified the classes as (1) workers who suffered a work-related injury on one work shift and (2) workers who suffered a work-related injury on more than one work shift. *Henry*, ¶ 27.

### 1(B). *Are the identified classes similarly situated?*

¶68 An equal protection violation cannot occur if the classes are not similarly situated; such discrimination can only be found in the unequal treatment of people in similar circumstances. The goal of identifying a similarly situated class is to isolate the factor

allegedly subject to impermissible discrimination. Thus, two groups are similarly situated if they are equivalent in all relevant respects except the factor constituting the alleged discrimination. *Goble*, ¶ 29 (citations omitted).

¶69 While I agree with the WCC's class descriptions, I conclude that the WCC incorrectly determined that the classes were not similarly situated because it fell into the same trap as it did in *Goble*. In *Goble*, ¶ 34, which raised an equal protection challenge to the statute that denied certain workers' compensation benefits to incarcerated people, this Court rejected the WCC's analysis of whether the classes presented were similarly situated, explaining:

> The WCC essentially came to the conclusion that the classes presented by Goble/Gerber were not similarly situated because a rational basis exists for treating incarcerated claimants differently from unincarcerated claimants. By doing so, the WCC subsumed the factor—incarceration—that we are trying to isolate and test against a rational basis. Defining the classes for equal protection analysis can be difficult and tedious, and if not done with clarity of vision, may result in the class definition swallowing up the factor we are attempting to examine.

¶70 In its Order in Hensley's case, the WCC found that Class 1 impairments were not similar to Class 2 or greater impairments because it found a "clear demarcation of the severity of the claimant's symptoms and functional limitations." In other words, it subsumed the factor—Class—that needs to be isolated and tested against a rational basis, coming to the conclusion that the classes Hensley presented were not similarly situated because a rational basis exists for treating permanently physically impaired claimants with no wage loss and an impairment categorized as Class 1 differently from permanently

39

physically impaired claimants with no wage loss and an impairment categorized as Class 2. In the words of *Goble*, ¶ 34, the WCC subsumed the factor it was attempting to examine.

¶71 Instead, in determining if the classes are similarly situated, this Court must ask, as it did in *Goble*, ¶ 29, if these two groups are "equivalent in all relevant respects other than the factor constituting the alleged discrimination." Simply put, they are: the factor constituting the alleged discrimination—Class categorization—is the only relevant difference between these classes. Therefore, all permanently partially disabled workers with wage loss are similarly situated once this sole distinguishing factor is isolated per *Goble*.

¶72 This is consistent as well with the way this Court determined whether classes were similarly situated in other workers' compensation cases. In *Satterlee*, ¶ 16, the Court found classes similarly situated where "the only identifiable differentiating factor between the two classes" was age—the precise factor constituting the alleged discrimination. In *Schmill v. Liberty Nw. Ins. Corp.*, 2003 MT 80, ¶ 18, 315 Mont. 51, 67 P.3d 290, the Court found classes similarly situated because the workers in both classes were physically impaired "[r]egardless of the time frame over which their affliction was contracted or the name assigned to the affliction." In *Stavenjord v. Mont. State Fund*, 2003 MT 67, ¶ 46, 314 Mont. 466, 67 P.3d 229, the Court again found that workers who were treated differently due to their status as having either an industrial injury or an occupational disease were similarly situated classes because they were "distinguished merely by the number of work shifts over which their work-related affliction is sustained." In each of these instances,

these were groups "equivalent in all relevant respects other than the factor constituting the alleged discrimination," as later described by *Goble*, ¶ 29.

¶73 Most analogous to the present case, in *Reesor v. Mont. State Fund*, 2004 MT 370, ¶ 12, 325 Mont. 1, 103 P.3d 1019, we found the classes proposed by Appellant Dale Reesor—(1) claimants eligible for PPD benefits who also received or were eligible to receive social security retirement benefits; and (2) claimants eligible for PPD benefits who did not receive and were not eligible to receive social security retirement benefits—to be similarly situated because both classes had suffered work-related injuries, were unable to return to their time-of-injury jobs, had impairment ratings, and had to rely on § 39-71-703, MCA, as their exclusive remedy under Montana law. Here, both proposed classes have suffered work-related injuries, are able to return to their time-of-injury jobs, have impairment ratings, and have to rely on § 39-71-703, MCA, as their exclusive remedy under Montana law. While *Reesor's* classes were distinguished by eligibility for social security retirement benefits, the classes in this case are distinguished by the *Guides'* Class categorization.

¶74 The WCC's examination of the Classes also fails in substance. Relying on the *Guides'* explanations, the WCC found that a person with a Class 1 impairment would have, at most, intermittent, mild physical findings with continuous treatment while a person with a Class 2 impairment would have "mild symptoms on a 'constant' basis or intermittent symptoms that are 'moderate' despite continuous treatment." Although the WCC saw a bright line between these descriptions, I find no definite line of when a "mild" symptom becomes a "moderate" symptom, or at what point "constant" becomes "intermittent."

41

¶75  Moreover, the WCC further supported its conclusion by observing, "It is not until a claimant obtains a Class 2 or greater whole person impairment rating that her symptoms and functional limitations impact normal activities and could reasonably be expected to impact her ability to work and possibly cause an actual wage loss in the future." Hensley argues that the WCC has manufactured a speculative, and non-existent, correlation between Class and likelihood of future impairment. She points out that the *Guides* specifically disclaim the WCC's speculation, as the *Guides* assert that no ready correlation between "impairment" and "disability" exists. As this Court has held, the impairment award's purpose is not to compensate for speculative future loss but for present loss of function regardless of wage loss. Section 39-71-703(2), MCA; *Rausch I*, ¶ 21; *Rausch II*, ¶ 23. Therefore, even if the WCC's conclusion that the classes are not similarly situated had not subsumed the factor to test as *Goble* warns, we would still conclude that the classes are similarly situated under the applicable case law. We therefore employ the rational basis test to determine if § 39-71-703(2), MCA, violates equal protection.

*2. Level of scrutiny*

¶76  For the second step of an equal protection analysis, we determine the appropriate level of scrutiny. It is well-settled that the rational basis test applies when considering equal protection challenges to the WCA. *Goble*, ¶ 35 (citations omitted).

*3. Rational basis test*

¶77  That brings us to the third step of an equal protection analysis: applying the appropriate level of scrutiny to evaluate the constitutional challenge. The rational basis test requires the government to show two things: (1) the statute's objective is legitimate;

42

and (2) the statute's objective bears a rational relationship to the classification used by the Legislature. *Henry*, ¶ 33. In other words, the statute must bear a rational relationship to a legitimate governmental interest. *Henry*, ¶ 33; *Goble*, ¶ 36. Rational basis review requires this Court to give the greatest amount of deference to the Legislature, such deference requiring this Court to allow legislation to stand if the Court can even conceive of a reason to justify the statute. *Reesor*, ¶¶ 29-30 (Rice, J., dissenting). Here, the question is whether a rational basis exists for treating injured workers who do not suffer a wage loss as a result of their industrial injury differently because of the Class in which their impairment rating is categorized.

### 3(A). Is the objective of § 39-71-703(2), MCA, legitimate?

¶78 Hensley argues that § 39-71-703(2), MCA, does not have a constitutionally permissible objective because the Legislature eliminated impairment awards for herself and other permanently physically impaired claimants with no wage loss and an impairment categorized as Class 1 solely for cost savings. While a goal of the WCA is assistance to the worker at a reasonable cost, § 39-71-105(1), MCA, Hensley points out that here, she and other injured workers with a permanent loss of physical function like her are not assisted. This Court has previously determined that the purpose of § 39-71-711, MCA, which created the criteria for impairment rating, was "to compensate workers for valid impairments resulting from injuries on the job." *S.L.H. v. State Comp. Mut. Ins. Fund*, 2000 MT 362, ¶ 33, 303 Mont. 364, 15 P.3d 948. Here, Hensley argues this objective is thwarted as she is not compensated for her valid impairment under § 39-71-703(2), MCA

43

(2011). Rather, because her impairment is categorized as Class 1, she is wholly denied a benefit to which she would otherwise be entitled.

¶79 In *Henry*, ¶ 42, this Court distinguished instances in which similarly situated groups received a different "degree of benefits" from instances of "the provision of certain benefits to one group of workers and the wholesale denial of the same benefits to another similarly situated group." The Court suggested that a wholesale denial was more likely a violation of equal protection because the legitimate objective was suspect. After *Henry*, this Court offered additional guidance into how to examine such circumstance. In *Caldwell*, we determined that categorical denial of benefits based solely on age violated equal protection. In reaching this determination, we noted that *Reesor* concluded that a particular categorical denial of benefits violated equal protection while *Satterlee* concluded a different categorical denial did not. *Caldwell* observed that the dispositions "turned on the differences between the purposes and entitlement schemes of the varying kinds of benefits." *Caldwell*, ¶ 28.

¶80 Here, as the Court stated in *Rausch I*, ¶ 21, the purpose of an impairment award is to "compensate the worker for the loss of physical function of his or her body." It is unquestionable that a person with a ratable impairment has in fact suffered a "loss of physical function" irrespective of wage loss and irrespective of Class designation. As for the entitlement scheme, under the *Guides*, the whole person impairment percentage, not Class designation, quantifies that loss. Section 39-71-703, MCA, then provides a formula for compensating for that quantifiable loss. As *Caldwell*, ¶ 32, explains, identification of

44

the purpose and entitlement scheme must guide this Court's analysis in determining whether the categorical elimination of specific benefits violates equal protection.

¶81 In this instance, the Court must ask if the categorical denial of these benefits undermines the purposes and entitlement scheme of impairment awards.[4] In considering whether the disparate treatment under § 39-71-703(2), MCA (2011), fulfills a legitimate objective, I examine Hensley's assertion that the Legislature eliminated impairment awards for certain injured workers with a permanent loss of physical function solely for cost savings. In *Henry*, ¶ 45, this Court held that a statutory scheme that provided rehabilitation benefits to workers who had suffered an industrial injury but denied rehabilitation benefits to workers who suffered from an occupational disease was not rationally related to the legitimate governmental interest of returning workers to work as soon as possible. In reaching this conclusion, this Court rejected cost savings as a permissible rational basis. Relying on established precedent, it explained, "Any argument that economic reasons justify treating the two classes differently must be rejected." *Henry*, ¶ 40.

¶82 However, while cost savings may not be the sole basis, this Court has consistently held that cost containment is a legitimate governmental interest that the Legislature may pursue in revisions to the WCA; however, in so doing, the Legislature must follow rational means, and cost savings may not be the sole reason for disparate treatment. *Caldwell*, ¶ 34 (citing *Satterlee*, ¶ 29). "We must scrutinize attempts to disguise violations of equal

---

[4] In his Dissent in this case, Justice Sandefur fully explains how such wholesale denial violates equal protection by bearing no rational relationship to the WCA's quid pro quo purpose.

45

protection as legislative attempts to 'contain the costs' or 'improve the viability' of the workers' compensation system." *Caldwell*, ¶ 35 (citing *Satterlee*, ¶ 29). The Legislature's goal of cost savings in the present case is unquestionably legitimate; however, by itself it provides insufficient basis to support disparate treatment under the statute.

¶83 I agree with the Plurality that providing impairment-only awards to those functionally impacted by an injury, despite lack of wage loss, serves a legitimate objective and having chosen to provide such awards, the Legislature may choose a classification system that provides consistency and uniformity in functional assessment, ensuring that *people with similar functional limitations are given like classifications*. Here, however, they are not, because a person with a 12% impairment rating, who is unquestionably similar to a person with a 12% impairment rating, may be designated Class 1, 2, 3, or 4, which are by definition not "like classifications." I further agree that "[i]n the context of impairment-only awards, the government has a legitimate interest in providing benefits that bear a reasonable relationship to the actual functional loss a worker sustains." Plurality, ¶ 29. Here, however, that relationship is lost where certain workers who suffer a permanent functional loss are denied compensation while others with quantifiably identical loss are compensated.

¶84 MSF argues that cost savings was not the sole objective because the Legislature realized cost savings while reallocating the money available in the workers' compensation system. MSF asserts that we must look at H.B. 334 as a whole: some provisions sought to increase benefits, while other sections decreased costs, with the intention to "strengthen and reinforce the viability of the system." MSF does not deny that the purpose for the

46

revision to § 39-71-703(2), MCA, viewed alone, was cost savings. Rather, MSF argues that this Court should consider that elsewhere in the Bill, benefits were increased to injured workers MSF asserts are "those most entitled." Essentially, MSF argues that the Legislature engaged in a Robin-Hood-esque endeavor, taking benefits from some injured workers and giving a portion of those eliminated benefits to others, all the while enjoying "cost savings" in the difference between the amount taken from some and the amount given to others.

¶85 This Court soundly rejected this same allocation rationale in *Caldwell*, where MSF argued that the rational basis of a statute which denied rehabilitation benefits to older workers was "tailoring benefit entitlement to need." *Caldwell*, ¶ 44. In so doing, this Court stated, "We know of no authority to support the argument that the legislature can eliminate benefits from one class of people *in order to* continue providing benefits to another class of similarly situated people." *Caldwell*, ¶ 43 (emphasis in original). Here, MSF argues that the Legislature eliminated impairment awards for permanently physically impaired workers with a Class 1 impairment and no actual wage loss in order to increase benefits to permanently partially disabled workers with an actual wage loss in the form of additional weeks of PPD benefits—the class identification MSF urged and which the WCC and this Court rejected. However, MSF does not provide the authority for reallocation that *Caldwell* found lacking. *Caldwell*, ¶ 44, further states, "We reject the suggestion that the legislature constitutionally can eliminate rehabilitation benefits for older workers so as to 'tailor' or provide benefits to those in 'need,' which presumably means younger workers." The *Caldwell* Majority rejected the *Caldwell* Dissent's assertion that the Legislature could

47

categorically eliminate benefits for some workers in order to "channel resources" toward a different group of workers that the Legislature believed could better use those benefits. *Caldwell*, ¶ 45 (citing *Caldwell*, ¶ 71 (Baker, J., dissenting, and Rice, J., joining)). The allocation rationale rejected in *Caldwell* is indistinguishable from the present rationale offered by MSF, which maintains that the Legislature may take Hensley's entitlement to an impairment award in order to increase the biweekly benefits awarded to a permanently partially disabled worker who suffered wage loss.

¶86 While MSF asserts a noble intent in the Legislature's purported attempt to "strengthen the viability" of the WCA, this Court has previously recognized that claims to improve the "viability" of the workers' compensation system is merely a euphemism for cost savings. *Caldwell*, ¶ 35. Hensley points out that H.B. 334's fiscal note predicted that eliminating impairment awards for these injured workers would create a cost savings of $8 million annually. Under MSF's argument, so long as the Legislature, within the same bill, minimally increases benefits to some workers, it can arbitrarily eliminate benefits for other workers without running afoul of equal protection. Although the Plurality points out that adding 25 weeks to PPD benefits not only adds this amount to those workers who receive biweekly PPD benefits, but also affects the multiplier used for calculating impairment awards, this reallocation in no way benefits Hensley and other workers who are designated Class 1 and who do not suffer wage loss. Prior to 2019, Hensley and those similarly situated would have been entitled to 375 times something; now, they are entitled to 400 times nothing. Further, as Justice Sandefur more fully explains in his Dissent, this

48

discriminatory categorical exclusion also does not further the quid pro quo purposes of the WCA.

¶87    Workers' compensation benefits are the property of the individual claimant. *Lockhart v. New Hampshire Ins. Co.*, 1999 MT 205, ¶ 24, 295 Mont. 467, 984 P.2d 744. As such, these benefits cannot be given away to someone else "more deserving." At issue in the present case is whether permanently physically impaired workers with Class I designations and no wage loss are denied equal protection of the law as compared to similarly situated individuals—not whether some other, non-similarly situated individuals received increased benefits courtesy of H.B. 334.

¶88    The Plurality contends this argument is too simplistic because the Legislature may treat similarly situated individuals differently so long as its reason for doing so is not arbitrary. However, the Plurality has truncated the equal protection analysis; the question of arbitrariness goes to the *next* step—whether the statute's objective bears a rational relationship to the classification used by the Legislature. Before we reach that step, we must *first* determine if that objective is a legitimate governmental objective. Under *Caldwell*, reallocation is not.

¶89    Other justifications MSF offers are also unpersuasive. MSF alleges that a rational basis for the elimination of an impairment award for permanently partially impaired individuals who have no actual wage loss and who are designated as a Class 1 impairment pursuant to § 39-71-703(2), MCA, is the WCA's purpose of compensating workers who suffer an actual wage loss due to their work-related injury or condition. However, § 39-71-703(2), MCA, does not categorically eliminate impairment awards for workers

who do not experience actual wage loss and this purported basis does not account for the disparate treatment among the classes identified in this case: workers with no actual wage loss. MSF similarly points out that § 39-71-105(1), MCA, provides that wage-loss benefits should bear a reasonable relationship to actual wages lost as a result of a work-related injury or disease. In the case of workers with no actual wage loss, there is no question that the impairment award is not a "wage-loss" benefit; moreover, this public policy does not provide a basis for disparate treatment of workers without actual wage loss because their impairments, regardless of Class, have an identical relationship to their actual wage loss of zero.

¶90     The only legitimate basis for the Legislature's action in eliminating benefits to this category of workers is cost savings, an insufficient basis to fulfill a legitimate governmental objective by itself and thus I would conclude § 39-71-703(2), MCA, unconstitutionally violates Hensley's right to equal protection. Since I would conclude § 39-71-703(2), MCA, meets no legitimate governmental objective, it would not be necessary to consider whether its objective bears a rational relationship to the classification used by the Legislature. However, I address this issue in response to the Plurality's faulty conclusion that overall cost savings in the scheme of the entire WCA is a legitimate governmental objective.

### 3(B). Does the objective of § 39-71-703(2), MCA, bear a rational relationship to the classification used by the Legislature?

¶91     The rational basis test has two parts: whether there is a legitimate objective, and whether that objective bears a rational relationship to the classification used by the Legislature. *Henry*, ¶ 33. I do not believe a legitimate governmental objective exists.

However, I have further considered whether, assuming a legitimate governmental objective exists, the Legislature's denial of impairment awards based on Class designation would constitute an arbitrary denial of benefits.

¶92 It is unquestionably within the purview of the Legislature to reduce benefits in a non-arbitrary way, as Hensley acknowledges. However, she contends that if the Legislature chooses to reduce impairment benefits, it must do so via a rational method. Hensley argues that even if this Court finds a rational objective for § 39-71-703(2), MCA, the statute would still fail to pass constitutional muster because there is no relationship between Class designation and severity of impairment; thus it denies benefits to an arbitrary group of impaired workers. Hensley points to *S.L.H.*, ¶ 33, in which this Court observed that while the legislative history on the development of criteria for impairment ratings "provides little insight, clearly the requirements for establishing impairments are intended to ensure that the level of impairment is determined by a scientifically sound method, using objective medical findings."

¶93 As noted above, the 6th edition of the *Guides* introduced a universal grid of "Class" categorizations for permanent impairments, and the 2011 Legislature used the Class designation to determine which injured workers with permanent impairments would or would not qualify for an impairment award. Hensley asserts that Class is not a reliable measuring instrument. She argues the *Guides* themselves recognize it is premature to find significance in Class in comparing permanently impaired individuals to determine relative degree of impairment because the Class designation has not been validated. Hensley notes that Montana is the *only* state to place any significance on Class in its statutory

51

compensation scheme and argues that tying entitlement to Class is improper because Class does not measure overall impairment severity and does not directly correlate to whole person impairment—the very measure that § 39-71-711(1)(c), MCA, requires us to employ to determine impairment rating. Once the impairment rating is expressed as a whole person percentage under § 39-71-711(1)(c), MCA, the impairment award is calculated using that rating by employing the formula prescribed by § 39-71-703, MCA.

¶94 Hensley's equal protection challenge rests upon the fact that using Class to eliminate certain permanently impaired workers' entitlements to impairment awards means some permanently impaired individuals without wage loss receive their impairment awards while others with the same whole person impairment rating receive nothing. In fact, if impairment award entitlement is categorically denied to all permanently impaired workers with Class 1 designations who do not have wage loss, these individuals will receive nothing while other permanently impaired workers who do not have actual wage loss and who have *lower* whole person impairment percentages will receive impairment awards. This Court has previously rejected such outcome, holding in *Rausch I*, ¶ 29, that to conclude permanently partially disabled workers were entitled to an impairment award while permanently totally disabled workers were not would be an absurd result because more-disabled claimants would receive fewer benefits than less-disabled claimants. Upholding Class as the means of determining impairment award eligibility dictates that rejected result here if Hensley is correct in her assertion that Class does not correlate with severity of impairment, extent of disability, or likelihood of future wage loss.

52

¶95    Hensley urges this Court to take a closer look at the *Guides* to determine if the use of Class to deny benefits violates equal protection because § 39-71-711(1)(b), MCA, dictates that impairment ratings be based on the 6th edition of the *Guides*. In order for us to determine if Class is an arbitrary method for determining whether an otherwise eligible permanently injured worker is entitled to an impaired award, we must understand how Class is determined and what the Class designation means.

### 3(B)(1). *A Guide to the* Guides

¶96    The *Guides* provide "operational definitions" of "impairment," "disability," and "impairment rating." "Impairment" is "a significant deviation, loss, or loss of use of any body structure or body function in an individual with a health condition, disorder, or disease." "Disability" is "activity limitations and/or participation restrictions in an individual with a health condition, disorder, or disease." An "impairment rating" is a "consensus-derived percentage estimate of loss of activity reflecting severity for a given health condition, and the degree of associated limitations in terms of [activities of daily living]." *Guides* at 5.

¶97    The *Guides* characterize the relationship between impairment and disability as "complex and difficult, if not impossible, to predict." *Guides* at 5. In other words, the evidence available to the expert authors of the *Guides* does not support the theory that the most-impaired people are likely to be the most-disabled, and vice versa, no matter how commonsense such notion might appear. The *Guides* also recognize the principle that there is no direct correlation between an injury's severity and the impact it has on the life, or working ability, of the injured person:

In some conditions there is a strong association between level of injury and the degree of functional loss expected in one's personal sphere of activity (mobility and ADLs). The same level of injury is in no way predictive of an affected individual's ability to participate in major life functions (including work) when appropriate motivation, technology, and sufficient accommodations are available. Disability may be influenced by physical, psychological, and psychosocial factors that can change over time.

*Guides* at 5-6. As the *Guides* offer for example, "[A] given physical impairment can be highly disabling in one vocational context and virtually non-disabling in another. For example, amputation of one's great toe might preclude the vocation of a ballerina who must dance 'on point,' whereas the same amputation might be of no functional consequence to a construction worker equipped with an appropriately fitted work boot." *Guides* at 6. In her opening brief, Hensley posits that an attorney with the same permanent impairment as her would be able to return to and successfully perform their time-of-injury employment, while a carpenter or painter may not. For this reason, the impairment award compensates for the purely medical determination of whole person impairment rating without regard to actual wage loss. Simply put, there is no ready correlation between impairment award and wage loss, or even likelihood of wage loss.

¶98 The Plurality overlooks the crucial distinction the *Guides* make between "impairment" and "disability," and the fact that the impairment rating calculates only the former. In discussing the impact of work-related injuries, the Plurality relies on the *Guides'* definition of "disability" to argue in favor of limiting impairment awards, Plurality, ¶ 39, when the impairment rating does not purport to measure, or take into account, "disability." This Court cannot examine whether the objective of § 39-71-703(2), MCA, bears a rational

relationship to the classification used by the Legislature without understanding the injury for which the statute is intended to compensate.

¶99 The 6th edition of the *Guides* implemented a uniform system across all impairments that would, in addition to the percentage-based impairment rating, categorize each impairment in what the *Guides* describe as a "5-Scale Taxonomy." *Guides* at 11-16. The five Scales are the five Classes, ranging in severity from Class 0 ("no functional problem") to Class 4 ("complete problem with total functional loss"). While the *Guides* anticipated that in the future, these classes could lead to a functionally based percentage of loss, the process is "as yet unverified" and must await formal validation studies. *Guides* at 11.

¶100 This "5-Scale Taxonomy" is incorporated into a grid that is customized for each body part or type of disorder, such as "lower extremity peripheral vascular disease," "pulmonary dysfunction," and "voice and speech impairment." Each grid consists of six components. These components are class, impairment percentage range, and four "impairment criteria:" history of clinical presentation; physical findings; clinical studies or objective test results; and functional history or assessment. The grid dictates the impairment evaluator's approach to determining impairment: First, the evaluator must determine which of the four "impairment criteria" the *Guides* designate as the "key factor" for the body part or type of disorder at issue. Based on the description of severity for that key factor, the evaluator will then assign the individual a Class designation. In other words, key factor, and key factor alone, determines the Class. Each Class designation corresponds to a range of impairment percentages available to those individuals assigned that Class. Consideration of the three remaining criteria—those which are not the "key factor"—

55

determines where the evaluator places the permanently impaired worker in the range of available impairment percentages within the designated Class. Notably, the range of available impairment percentages within each Class varies significantly from grid to grid—or from body part to body part.

¶101 To use Hensley's case as an example, the key factor for her shoulder injury is the history of physical presentation—in other words, her initial diagnosis. *Guides* at 385. Using Hensley's diagnosis, and only her diagnosis, her impairment evaluator categorized her permanent impairment in Class 1. Therefore, regardless of the evaluator's physical findings, the results of any clinical studies or tests, or any functional history or assessment performed—in other words regardless of all the other evidence an evaluator must consider prior to determining an impairment rating—Hensley's permanent impairment would remain within the Class I categorization on the impairment rating grid. The key factor in Hensley's case is the criteria that the *Guides* frequently, but not universally, designate as the key factor: The *Guides* advise that history of physical presentation, or diagnosis, is the key factor for "most organ systems or disease processes." *Guides* at 12. The *Guides* do not suggest that this key factor, or any of the four key factors, is somehow more important than the remaining factors in determining whole person impairment percentage.

### 3(B)(2). *Is Class an arbitrary distinction?*

¶102 Hensley argues that the method by which Class is designated forms an arbitrary and unscientific basis to deny impairment awards because the Class designation—which the *Guides* cautions is an "as yet" unverified process—is determined by only a fraction of the information which is used to determine impairment rating, and because the whole person

impairment rating percentages do not correlate to Class designations universally. As appellate counsel explained during oral argument, for Class 1 designations, a worker is denied their impairment award before their doctor finishes the examination and calculates whole person impairment because only the "key factor" determines Class even though the remaining factors contribute to the whole person impairment percentage. Hensley contends that under Montana law and under the *Guides*, the same whole person impairment rating is the same whole person impairment rating, regardless of whether it is an arm injury, a back injury, or some other injury. However, a 12% impairment rating could be designated as a Class 1, 2, 3, or 4, depending on which impairment grid applies and which key factor is used for that grid. Thus, for these permanently impaired workers without an actual wage loss, those whose 12% impairment rating is designated as a Class 2, 3, or 4 receive their full impairment award, while the permanently injured workers without an actual wage loss whose 12% impairment rating is designated as a Class 1 receive nothing.[5]

¶103 In other words, under § 39-71-703(2), MCA (2011), two similarly situated individuals who have not only suffered a measurable loss of functionality, but have suffered the *same amount* of loss of functionality, obtain significantly different benefits based only on the non-validated Class designation. Hensley thus argues that to deny an impairment award on the basis of Class alone is irrational; it gives Class more *legal*

---

[5] At oral argument, Hensley's counsel provided the Court with a handout, as allowed by M. R. App. P. 17(6)(a), in which they provide the following whole person impairment percentage ranges by Class designation: Class 1 ranges from 1% to 15%; Class 2 ranges from 2% to 32%; Class 3 ranges from 4% to 65%; and Class 4 ranges from 10% to 100% whole person impairment percentage.

meaning than impairment percentage when it has less *medical* meaning than impairment percentage in spite of the fact that an impairment rating is a purely medical determination. Section 39-71-711(1)(a), MCA.

¶104   The Plurality attempts to distinguish *Caldwell* from this case on the basis that age is an arbitrary classification while "difference in a worker's functional limitation" is not. Plurality, ¶ 32.   It maintains that the reason for this distinction is because age, the distinguishing factor in *Caldwell*, has nothing to do with a worker's ability to return to work.  However, neither does functional limitation: the *Guides* explain that while in some conditions there may be "a strong association between level of injury and the degree of functional loss expected in one's personal sphere of activity," it is *not* "predictive of an affected individual's ability" to return to work.   If age was an arbitrary classification because of its lack of relationship to ability to return to work, then functional limitation is also an arbitrary classification for the exact same reason.

¶105   Use of Class to determine entitlement to an impairment award also fails because a worker's functional limitation is expressed as the whole person impairment percentage, so we have not established that there *is* a difference in a worker's functional limitation between a 12% impairment award that's been designated a Class 1 and a 12% impairment award that's been designated Class 2.  The Plurality asserts, "Hensley's and the Dissent's characterization is that the *Guides'* adoption of a uniform system of Classes, and the Legislature's reliance on that classification system, does not 'take benefits' from a class of workers to give them to another."  Plurality, ¶ 33.  Neither Hensley nor the Dissent allege this; rather MSF argued that a legitimate objective of § 39-71-703(2), MCA, eliminating

impairment-only awards for Class 1 workers without wage loss is that the Legislature took some of the money saved from eliminating those benefits to give more weeks of biweekly payments to workers who are entitled to PPD benefits.

¶106   MSF does not deny that workers without wage loss and with identical whole person impairment ratings are treated differently under § 39-71-703(2), MCA, on the basis of which Class their impairment falls into.  However, MSF argues that this disparate treatment does not violate equal protection because the Legislature had a rational basis in making this distinction in workers' entitlement to an impairment award.  MSF acknowledges that the use of the Class designation may be "imperfect," but points out that this Court has held that classifications may be imperfect and yet not violate equal protection.  *Gulbrandson v. Carey*, 272 Mont. 494, 503, 901 P.2d 573, 579 (1995) (citation omitted).  However, while they may be imperfect and yet survive an equal protection challenge, they may not be arbitrary such that there is no rational basis to support disparate treatment of otherwise similarly situated classes.

¶107   The Plurality asserts, "For the statute to fail on a facial challenge, we would have to conclude that the Legislature must award an impairment benefit to any worker with the slightest impact from a work-related injury."  Plurality, ¶ 39.  That is inaccurate; rather we would conclude that the Legislature cannot treat similarly situated workers disparately.  A worker with a 2% impairment award and no wage loss has suffered the same "slight[]" impact" as a worker with a 2% impairment award and no wage loss.  To give one worker with a 2% whole person impairment their full impairment award and deny the other any impairment award on the basis of Class is disparate treatment.  In *Caldwell*, ¶ 50, this Court

59

determined that § 39-71-710, MCA, which denied rehabilitation benefits to workers who were eligible for social security retirement benefits, bore no rational relationship to any legitimate governmental interest because "[e]ligibility for social security benefits bears no rational relationship to a worker's ability or willingness to return to work." In *Reesor*, ¶ 23, this Court determined that there was no rational relationship to any legitimate governmental interest in denying PPD benefits to a worker on the basis of age because social security retirement benefits bear no relationship to disability benefits. Here, as demonstrated by Hensley, and by the language of the *Guides*, Montana's impairment award is determined by applying a formula to the permanently impaired worker's whole person impairment rating, and there is no correlation between the whole person impairment rating and Class, an "as yet" unverified categorization system. For the reasons set forth above, denial of impairment award on the basis of Class designation is arbitrary and therefore does not demonstrate a rational relationship between the statute's objective and the classification used by the Legislature. As such, it violates equal protection.

## CONCLUSION

¶108 The Plurality has not distinguished our holding in *Caldwell* that squarely rejected the same objective as a legitimate governmental objective as it accepts here. I would hold the WCC erred when it denied Hensley's motion for summary judgment and granted summary judgment to MSF. I would further hold that § 39-71-703(2), MCA (2011), violates Article II, Section 4, of the Montana Constitution by denying an impairment-only award to Hensley and all similarly situated injured workers who did not suffer a wage loss

60

as a result of their work-related injury and who received an impairment rating that was categorized as a Class I impairment under the *Guides*.

/S/ INGRID GUSTAFSON

Justice Dirk Sandefur and Judge Jessica Fehr join in the dissenting Opinion of Justice Gustafson.

/S/ DIRK M. SANDEFUR
/S/ JESSICA FEHR
District Court Judge Jessica Fehr
sitting in place of Justice McKinnon

Justice Dirk Sandefur, dissenting.

¶109   I dissent from the Court's holding that § 39-71-703(2), MCA (2011), does not violate Montana's constitutional equal protection guarantee.  Section 39-71-703(2), MCA (2011), is not rationally related to the pertinent quid pro quo purpose of the Workers' Compensation Act (the Act) as a whole—to provide at least some substantial form of proportional compensation for permanent partial impairments without actual wage loss at reasonable cost to employers.

¶110   The version of the Act in effect at the time of a work-related injury governs a claim of right under the Act.  *Buckman v. Montana Deaconess Hosp.*, 224 Mont. 318, 321, 730 P.2d 380, 382 (1986).  The injury at issue occurred in January 2012, and is thus governed by the 2011 version of the Act.  In a substantial change from the 1995-2009 versions of the Act, the 2011 Legislature revised the Act to categorically eliminate compensation for permanent partial impairments with no actual wage loss for one class of injured workers,

61

while continuing to provide it to others based on a new scale of relative severity of injury applied to otherwise similar whole-body impairment ratings. Section 39-71-703(2), MCA (2011). Before subjecting this patently discriminatory change to appropriate equal protection scrutiny, a summary review of the recent history of compensation for permanent partial impairment with no wage loss is necessary for context.

    1.  <u>Modern History of Compensation under the Act for Permanent Partial Impairment Without Actual Wage Loss</u>.

¶111 The pre-1985 Act provided two forms of wage-related compensation for work-related permanent partial impairments—a disability award based on an actual wage loss or, alternatively as applicable, an indemnity award regardless of actual wage loss for certain types of injuries (*i.e.* specified dismemberments). Sections 39-71-703, -705, and 709(1), MCA (1981); *McDanold v. B.N. Transp., Inc.* (*McDanold II*), 208 Mont. 470, 477, 679 P.2d 1188, 1191-92 (1984) (citing *Walker v. H.F. Johnson, Inc.* (*Walker I*), 180 Mont. 405, 591 P.2d 181 (1978)); *Jones v. Claridge*, 145 Mont. 326, 330, 400 P.2d 888, 890 (1965) (characterizing the indemnity award as compensation for "possible loss of future earning capacity" and the disability award as "compensation in lieu of wages"). The specified compensation for both types of awards was "proportional to the degree of disability resulting from the injury." *McDanold II*, 208 Mont. at 476-77, 679 P.2d at 1191. The disability award was thus a function of a worker's proportional whole-body permanent partial disability and actual wage loss, applied to a specified formula for permanent partial disability awards. *See* § 39-71-703, MCA (1981); § 92-703 R.C.M. 1947 (1971); *McDanold II*, 208 Mont. at 477-79, 679 P.2d at 1191-93); *McDanold v. B.N. Transp. Inc.*

62

(*McDanold I*), 194 Mont. 300, 308, 634 P.2d 175, 180 (1981).  The alternative indemnity award was a function of a worker's whole-body disability rating and projected loss of future earning capacity, applied to a specified compensation formula.  *See Walker v. H.F. Johnson, Inc.* (*Walker II*), __ Mont. __, 639 P.2d 1138, 1139-40 (Mont. 1979) (modifying *Walker I* on rehearing); *Ramsey v. Duncan*, 174 Mont. 438, 440-41, 571 P.2d 384, 385 (1977); *Shaffer v. Midland Empire Packing Co.*, 127 Mont. 211, 213-14, 259 P.2d 340, 342 (1951), *superseded by* § 39-71-703, MCA (1995) *as recognized in Wilkes v. Mont. State Fund*, 2008 MT 29, ¶ 24, 341 Mont. 292, 177 P.3d 483.[1]

¶112   In 1981, the Legislature revised the Act to expressly clarify an "impairment" as a "purely medical condition," defined as an "anatomic or functional abnormality or loss of bodily function," proportionally measured by a whole-body impairment rating.  Section 39-71-122, MCA (1981).  The 1981 amendment also introduced the now familiar classes of temporary/permanent and partial/total disabilities (TPD, TTD, PPD, or PTD) compensable under the Act and defined the general term "disability" as the extent to which a worker's:

> ability to engage in gainful employment is diminished as a result of an impairment . . . combined with such factors as . . . physical condition, age, education, work history, and other factors affecting the worker's ability to engage in gainful employment.

[1] Though not expressly referenced by the pre-1981 Act, medical impairment ratings were the common evidentiary means by which treating physicians rendered expert opinions regarding a worker's whole-body permanent impairment as relevant to the worker's resulting proportional disability rating for purposes of determining the amount of wage-loss disability awards under alternative indemnity awards.  *See Grimshaw v. L. Peter Larson Co.*, 213 Mont. 291, 296, 691 P.2d 805, 807 (1984); *Cleveland v. Cyprus Indus. Minerals*, 196 Mont. 15, 18-19, 636 P.2d 1386, 1388-89 (1981); *Robins v. Anaconda Aluminum Co.*, 175 Mont. 514, 520, 575 P.2d 67, 71 (1978); *Ramsey v. Duncan*, 174 Mont. 438, 440-41, 571 P.2d 384, 385 (1977).

Section 39-71-121, MCA (1981).[2]

¶113  The pre-1987 formulas for permanent partial disability and indemnity awards effectively included elements of compensation for permanent loss of physical function and wage/earning capacity loss.  *See Grimshaw*, 213 Mont. at 295-96, 691 P.2d at 807 (distinguishing and applying limited holding of *Holton v. F.H. Stoltze Land & Lumber Co.*, 195 Mont. 263, 268-69, 637 P.2d 10, 13-14 (1981) (holding that PPD claimants were entitled to immediate payment of PPD disability benefits calculated on an undisputed impairment rating alone prior to the ultimate determination of resulting disability award)). *See also Monroy v. Cenex*, 246 Mont. 365, 371-72, 805 P.2d 1343, 1347 (1990) (noting incorporation and application of *Holton* holding and thus requiring immediate payment of new "impairment award" upon determination of undisputed impairment rating under 1987 Act); *Phelan v. Lee Blaine Enterprises*, 220 Mont. 296, 300, 716 P.2d 601, 603 (1986) (similarly manifesting limited application of *Holton*).  Thus, the pre-1987 Act did not provide for separate impairment awards to compensate for a permanent partial loss of physical function with no actual wage loss.

¶114  In 1987, the Legislature substantially revised the Act regarding permanent partial impairments by eliminating the dismemberment-based indemnity awards previously

---

[2] The 1981 amendment further clarified that the whole-body "impairment rating [was] the medical component" of the ultimate "medical-legal" disability rating upon which the Act based compensation under the various disability classes. *Grimshaw*, 213 Mont. at 296, 691 P.2d at 807. *See also* § 39-71-121, MCA (1981); *Sciuchetti v. Hurt Const.*, 238 Mont. 170, 174, 777 P.2d 308, 311 (1989).

provided under § 39-71-705, *et seq.*, MCA, and splitting PPD disability awards into two separate benefits—PPD "impairment awards" and PPD "wage supplement benefits." Section 39-71-703(1), MCA (1987 Mont. Laws ch. 464, §§ 23 and 68). Similar to the actual wage-loss component of the prior PPD disability awards, the purpose of the new "wage supplement benefits" was to restore the injured worker to his or her "pre-accident wage level . . . upon return to work" in a different capacity than prior to injury. *Rausch v. State Comp. Ins. Fund* (*Rausch II*), 2005 MT 140, ¶ 23, 327 Mont. 272, 114 P.3d 192. *See also* § 39-71-703(1)(b), MCA (1987). In contrast, the new "impairment award" distinctly provided a degree of proportional compensation regardless of actual wage loss. Sections 39-71-116(14) and -703(1)(a), MCA (1987); *Rausch II*, ¶¶ 12-15 and 23.[3] Consistent with prior practice, the 1987 Act expressly required permanent impairment ratings in accordance with "the current edition of the Guides to Evaluation of Permanent Impairment published by the American Medical Association." (AMA Guides.) Section 39-71-711, MCA (1987 Mont. Laws ch. 464, § 24).

¶115   In 1991, the Legislature again substantially revised § 39-71-703, MCA, this time to eliminate separate PPD impairment awards and wage supplement benefits in favor of a single PPD "disability benefit award." Section 39-71-703(1)-(2), MCA (1991). The new "disability benefit award" was a function of a total percentage (*i.e.* the sum of a worker's whole-body impairment rating determined by the "latest edition of the [AMA] Guides" and

---

[3] *See also Goble v. Montana State Fund*, 2014 MT 99, ¶ 30 n.4, 374 Mont. 453, 325 P.3d 1211 (noting similar purpose of impairment awards over ongoing statutory evolution).

various other applicant-specific percentages) and the worker's pre-injury wages under a specified compensation formula. Section 39-71-703(1)-(4), MCA (1991). *See also* § 39-71-711(1)(b), MCA (1991) ("impairment ratings" based on "current edition" of the AMA Guides). Despite elimination of separate impairment awards, the 1991 Act continued to effectively provide compensation for permanent partial impairments without wage loss via distinctions in the "disability benefit award" formula. *See* § 39-71-703(3), MCA (1991).

¶116 In 1995, the Legislature revised the Act to make PPD disability benefits narrowly available only to workers with permanent partial impairments *and* actual wage loss. Sections 39-71-116(22) and -703(1)(a), MCA (1995). The 1995 amendment thus categorically excluded workers with permanent partial impairments and no actual wage loss from eligibility for PPD disability awards, but then made them eligible for a separate proportional "impairment award only." *See* §§ 39-71-116(22) and -703(1)-(2), MCA (1995). The post-1995 Act continued to require permanent impairment ratings in accordance with the "latest edition" of AMA Guides. Section 39-71-703(1)(a)(ii), MCA (1995). *See also* § 39-71-711(1)(b), MCA (1995) (referencing "current edition" of the Guides). Eligibility for no-wage-loss, impairment-only awards thereafter remained constant for sixteen years until 2011.

¶117 In 2011, however, the Legislature limited the availability of no-wage-loss, impairment-only awards. Rather than the "latest" or "current" edition, the 2011 amendment revised the Act to more specifically require impairment ratings in accordance with the "sixth edition" of the AMA Guides. Sections 39-71-116(27), -703(1)-(2),

and -711(1)(b), MCA (2011). The change was significant because, unlike prior editions which merely determined a single whole-body permanent impairment rating percentage, the sixth edition of the Guides further subdivided impairment ratings into four subclasses of relative severity, from one (lowest) to four (highest). Based on the new relative severity subclasses, the 2011 amendment further revised the Act to limit compensation for permanent partial impairments and no wage loss only to workers with a relative severity rating of "Class 2 or greater," thereby categorically eliminating any form of compensation for Class 1 permanent partial impairments. Section 39-71-703(2), MCA (2011).

2. Essential Quid Pro Quo Structure and Purpose of the Act.

¶118 From original enactment in 1915, the Act has been a delicate public policy compromise, with the essential quid pro quo purposes and effects of (1) depriving workers of otherwise available tort remedies (which previously afforded them opportunity for full compensation), in return for some lesser form of guaranteed no-fault compensation for work-related injury, and (2) depriving employers of advantageous common law defenses in tort, in return for limited and predictable liability for employee injuries. *See* §§ 39-71-105(1), -124, and -411, MCA (2011); *Royal Ins. Co. v. Roadarmel*, 2000 MT 259, ¶ 29, 301 Mont. 508, 11 P.3d 105; *Henry v. State Comp. Ins. Fund*, 1999 MT 126, ¶ 12, 294 Mont. 449, 982 P.2d 456; *Sitzman v. Shumaker*, 221 Mont. 304, 307, 718 P.2d 657, 659 (1986); *Madison v. Pierce*, 156 Mont. 209, 213-14, 478 P.2d 860, 863 (1970); *Mahlum v. Broeder*, 147 Mont. 386, 392-95, 412 P.2d 572, 575-77 (1966); *State ex rel. Morgan v. Indus. Accident Bd. of Mont.*, 130 Mont. 272, 278-79, 300 P.2d 954, 958 (1956); *Chisholm v. Vocational Sch. for Girls*, 103 Mont. 503, 512-13, 64 P.2d 838, 844 (1936); *Shea v.*

67

*North-Butte Mining Co.*, 55 Mont. 522, 528-29, 179 P. 499, 501 (1919); *Lewis & Clark County v. Industrial Accident Bd.*, 52 Mont. 6, 9-13, 155 P. 268, 270-71 (1916). Within the framework of this essential quid pro quo, the Legislature retains broad discretion under Article III, Section 1, of the Montana Constitution to determine the level, type, and manner of compensation and benefits available to injured workers under the Act, except as limited by Article II, Sections 4 and 16-17 (individual rights to full legal redress, equal protection, and due process of law). *See Henry*, ¶¶ 38-40 and 44-45 (invalidating discriminatory denial of rehabilitation benefits among similarly situated classes of injured workers); *Stratemeyer v. Lincoln Cty.* (*Stratemeyer I*), 259 Mont. 147, 153-55, 855 P.2d 506, 510-511 (1993) (upholding across-the-board denial of compensation for mental stress injury not resulting from physical injury); *Ingraham v. Champion Int'l*, 243 Mont. 42, 48, 793 P.2d 769, 772 (1990) ("power of the legislature to fix the amounts, time and manner of payment of workers' compensation benefits is not doubted").

    3.  <u>Equal Protection and Section 39-71-703(2), MCA (2011)</u>.

¶119  "No person shall be denied equal protection of the laws." Mont. Const. art. II, § 4. Depending upon the nature of the legally cognizable right or interest affected, legislative enactments are subject to one of three recognized standards of constitutional scrutiny for purposes of equal protection—strict scrutiny, middle-tier scrutiny, or rational basis scrutiny. *See Bustell v. AIG Claims Serv., Inc.*, 2004 MT 362, ¶¶ 19-20, 324 Mont. 478, 105 P.3d 286; *Powell v. State Comp. Ins. Fund*, 2000 MT 321, ¶ 21, 302 Mont. 518, 15 P.3d 877; *Henry*, ¶ 29. The right to equal protection of law prohibits the government, whether through legislative enactment or otherwise, from treating similarly situated classes

of individuals differently, except as permissible under the appropriate level of constitutional scrutiny.

(A) Applicable Level of Constitutional Scrutiny.

¶120 For purposes of equal protection, rational basis scrutiny generally applies to discriminatory laws that neither affect the exercise of other fundamental constitutional rights, nor discriminate on a constitutionally suspect basis. *Bustell*, ¶ 19; *Henry*, ¶ 29; *Powell*, ¶ 21. Provisions of the Act are generally subject to equal protection challenge only under rational basis scrutiny because the discriminatory manner and provision of compensation for work-related injury under the Act generally does not affect other fundamental constitutional rights or discriminate on a constitutionally suspect basis. *Bustell*, ¶ 19; *Powell*, ¶ 21; *Henry*, ¶ 29; *Ingraham*, 243 Mont. at 48, 793 P.2d at 773.

(B) Discriminatory Classification/Treatment.

¶121 For purposes of equal protection, classes of individuals are similarly situated if they are similar but for the disputed basis of discrimination at issue. *Goble*, ¶ 29 (internal citations omitted). Even facially neutral legislation may be discriminatory if it has a discriminatory purpose and effect on otherwise similarly situated classes. *State v. Spina*, 1999 MT 113, ¶ 85, 294 Mont. 367, 982 P.2d 421; *Fitzpatrick v. State*, 194 Mont. 310, 323, 638 P.2d 1002, 1010 (1981); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 and 278-79, 99 S. Ct. 2282, 2292 and 2296 (1979).

¶122 Here, § 39-71-703(2), MCA (2011), effects two classes of injured workers with permanent partial impairments—those with no actual wage loss and a Class 1 impairment rating, and those with a similar whole-body impairment rating, no actual wage loss, and a

69

Class 2 or greater relative severity rating. Because those classes differ only as to relative severity rating, § 39-71-703(2), MCA (2011), facially discriminates, based on relative severity of impairment, in the provision of compensation between otherwise similarly situated classes of injured workers with permanent partial impairment ratings.

(C) Application of Rational Basis Scrutiny.

¶123 A discriminatory legislative classification survives rational basis scrutiny only if it rationally relates to, *i.e.* furthers, a legitimate government purpose. *Kottel v. State*, 2002 MT 278, ¶ 34, 312 Mont. 387, 60 P.3d 403; *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S. Ct. 2326, 2332 (1992). *Accord Bustell*, ¶ 19; *Powell*, ¶ 21; *Henry*, ¶ 29. Legislative classifications are presumed constitutional under rational basis scrutiny and the challenging party bears the burden of demonstrating that the disputed classification does *not* rationally further a legitimate government purpose. *Henry*, ¶ 11 (internal citations omitted). Within the framework of the essential quid pro quo of the Act, a discriminatory provision of the Act survives rational basis scrutiny only if it rationally furthers the pertinent quid pro quo purpose of the Act as a whole. *See Caldwell v. MACO Workers' Comp. Trust*, 2011 MT 162, ¶¶ 23-48, 361 Mont. 140, 256 P.3d 923; *Henry*, ¶¶ 33-44; *Stratemeyer I*, 259 Mont. at 152-55, 855 P.2d at 509-11. In other words, a discriminatory classification in the Act survives rational basis scrutiny only if it furthers the pertinent *dual purpose* of the quid pro quo.

¶124 In *Stratemeyer I,* we considered whether the Act's categorial exclusion of compensation for work-related mental stress injury not resulting from physical injury (*i.e.* mental-mental injury) violated equal protection by compensating one form of work-related

70

injury but not another. *Stratemeyer I*, 259 Mont. at 149-52, 855 P.2d at 507-09. Within the framework of the quid pro quo of the Act, we held that the exclusion of compensation for mental-mental injuries rationally furthered the legitimate government interest of maintaining the continued viability of the compensation system for workers, at reasonable cost to employers. *Stratemeyer I*, 259 Mont. at 153-55, 855 P.2d at 510-11.

¶125   In *Henry*, we considered whether the exclusion of vocational rehabilitation benefits to injured workers under the Occupational Disease Act (ODA), while providing them to workers with a similar injury under the Act, based on whether the injury occurred acutely in a single work shift or cumulatively over multiple shifts, violated equal protection. *Henry*, ¶ 2.  The dispute involved an acute herniated disc injury that occurred on a single shift but which "was treated and accepted" as a compensable occupational disease under the ODA, rather than a compensable injury under the Act. *Henry*, ¶¶ 4 and 21.  Under the governing versions of both Acts, the same injury was compensable under either, but related vocational rehabilitation benefits for that injury were only available under the Act, not the ODA. *Henry*, ¶¶ 6 and 21.

¶126 Regardless of the different histories and purposes of the Act and the ODA, we recognized that the Acts discriminated between two classes of similarly situated workers—those who suffered an acute injury on one work shift and those who suffered a similar injury cumulatively caused over multiple work shifts. *Henry*, ¶¶ 27-28.  We first noted for purposes of rational basis scrutiny that the pertinent legitimate government purpose of both Acts was to help injured workers return to work, and that "[r]ehabilitation services [were] the only mechanism provided" under either to further that purpose. *Henry*,

71

¶¶ 35 and 38-39. We thus held that the ODA violated equal protection because providing rehabilitation benefits for an injury under the Act, and categorically denying them under the ODA for an injury that was similar but for cumulative or acute causation, was not rationally related to the pertinent common purposes of the Acts to help injured workers return to work. *See Henry*, ¶¶ 39-45 (distinguishing *Eastman v. Atl. Richfield Co.*, 237 Mont. 332, 339, 777 P.2d 862, 866 (1989)).

¶127 In *Caldwell*, we considered whether the Act's categorical denial of vocational rehabilitation benefits, based on social security eligibility, to workers who were able and willing to return to work in an alternative capacity violated equal protection. *Caldwell*, ¶¶ 5-6 and 50-51. The dispute involved a 74-year-old injured worker who desired to return to work in some other capacity, but was denied vocational rehabilitation benefits because he was eligible for social security. *Caldwell*, ¶¶ 5-6. Except for those eligible for social security, the Act provided vocational rehabilitation benefits to injured workers with permanent partial disabilities upon demonstration that they were willing, able, and had the opportunity to return to work in some alternative capacity. *Caldwell*, ¶¶ 12-13. We concluded that the Act thus discriminated between two otherwise similar classes of injured workers but for age-based social security eligibility. *Caldwell*, ¶¶ 16, 18, and 25.

¶128 After dismissing as illegitimate various other government interests asserted as justification for the discriminatory classification, we noted that the pertinent combined purpose of the Act was to provide rehabilitation benefits to aid willing and able workers' return to work, at reasonable cost to employers. *See Caldwell*, ¶¶ 31 and 34-48. However, noting that "cost alone is insufficient to justify the disparate treatment of similar classes,"

72

we focused on whether the "categorical elimination" of rehabilitation benefits to one class of injured workers based on social security eligibility was *also* rationally related to the Act's pertinent purpose of providing rehabilitation benefits to aid willing and able workers' return to work. *See Caldwell*, ¶¶ 36-48 (quoting *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 29, 353 Mont. 265, 222 P.3d 566). We ultimately held that the discriminatory classification violated equal protection because it was not rationally related to *both* aspects of the pertinent purpose of the Act—to aid willing and able workers' return to work, at reasonable cost to employers. *See Caldwell*, ¶¶ 48 and 50.

¶129 Despite the ongoing evolution of the Act since 1915, its constant over-arching quid pro quo purpose and provision has been, and continues to be, to provide at least some substantial form of guaranteed no-fault compensation and benefits for work-related injuries at reasonable cost to employers. *See Stratemeyer v. Lincoln Cty.* (*Stratemeyer II*), 276 Mont. 67, 74-79, 915 P.2d 175, 179-82 (1996); *Stratemeyer I*, 259 Mont. at 153-55, 855 P.2d at 510-11. Though we did not expressly reference the quid pro quo, the essential gravamen of *Stratemeyer I*, *Henry*, and *Caldwell* is that cost control is just one aspect of the pertinent quid pro quo purpose of the Act to which a discriminatory categorical exclusion or denial of compensation or benefits must rationally relate for purposes of equal protection. *See Caldwell*, ¶¶ 33-51; *Henry*, ¶¶ 25-45. *Compare Stratemeyer I*, 259 Mont. at 153-55, 855 P.2d at 510-11 (essentially holding that the categorical exclusion of a type

73

of compensation to all injured workers furthered both aspects of the quid pro quo).[4] In other words, a discriminatory categorical exclusion of compensation or benefits under the Act satisfies equal protection only if it rationally furthers the pertinent quid pro quo purpose of the Act in some, though not necessarily equal, degree of balance, as determined by the Legislature in its discretion. Thus, unlike in *Stratemeyer I*, the discriminatory classifications at issue in *Henry* and *Caldwell* could not survive rational basis scrutiny because, though they served the legitimate government interest in cost-control, they were contrary to the other inseparable aspect of the pertinent quid pro quo purpose of the Act, as applied to the disaffected classes.

¶130 While *Stratemeyer I* manifests that the Legislature can categorically exclude or cut-out compensation for a particular type of work-related loss without violating equal protection, *Stratemeyer II* illustrates the over-arching consequence of the quid pro quo. Montana workers have a fundamental constitutional right to "full legal redress" for employment-related injury, "except as to . . . [employment-related injuries] cover[ed] under the [Act]." Mont. Const. art. II, § 16. The right to full legal redress and its express workers' compensation exception constitutionally require preservation of the essential quid pro quo of the Act *as a condition* of depriving workers of otherwise available tort remedies for work-related injuries, and immunizing employers therefrom. *See Walters v. Flathead Concrete Prod., Inc.*, 2011 MT 45, ¶¶ 11-16, 359 Mont. 346, 249 P.3d 913 (citing *Adsem*

---

[4] *See also Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 29, 353 Mont. 265, 222 P.3d 566 (Legislature may discriminate in provision work-comp benefits between similar classes based on cost only if cost is not the sole reason for the discrimination).

*v. Roske*, 224 Mont. 269, 270-71, 728 P.2d 1352, 1353 (1986) and *Stratemeyer II*, 276 Mont. at 74-79, 915 P.2d at 179-82). As implemented by the exclusivity provision of the Act, the essential quid pro quo requires that the Legislature provide "*some form*" of substantial compensation for work-related injuries in return for depriving workers of otherwise generally applicable tort remedies. *Stratemeyer II*, 276 Mont. at 74-79, 915 P.2d at 179-82 (emphasis added). Thus, the categorical denial of at least some form of substantial compensation for a work-related injury otherwise compensable in tort eliminates the quid pro quo and subjects the employer to liability in tort. *Stratemeyer II*, 276 Mont. at 74-79, 915 P.2d at 179-82 (holding that categorical exclusion of compensation for mental-mental injury destroyed quid pro quo and rejecting assertion that work-comp exclusivity applies to non-compensable injuries as long the employment is "covered" under the Act). *Accord Kleinhesselink v. Chevron, U.S.A.*, 277 Mont. 158, 163, 920 P.2d 108, 111 (1996) (exclusion of compensation for mental-mental injury and physical injury caused by mental stress subjected employers to liability in tort for those injuries). *Compare Walters*, ¶¶ 6 and 12-16 (work-comp exclusivity barred third-party wrongful death/survivorship claims against employer because Act provided *some* degree of substantial compensation for the employee's death in the form of medical and burial expenses and survivor death benefits).

¶131 Here, regardless of relative severity or actual wage loss, a work-related permanent partial impairment of physical function would unquestionably be compensable in tort against an employer, but for application of the Act. *See* §§ 27-1-201 and -202, MCA. In accordance with its essential quid pro quo, the Act has thus historically provided some

75

form of proportional compensation for work-related permanent partial impairments regardless of actual wage loss, whether as a function of the permanent partial disability award formula or by separate impairment award. See *Monroy*, *Grimshaw,* and *Holton*, *supra*, and post-1987 versions of §§ 39-71-703 and -711, MCA. Here, except for Class 1 impairments, the 2011 version of the Act continues to provide proportional compensation for permanent partial impairments without actual wage loss. Sections 39-71-703(2) and -711(1), MCA (2011). Thus, providing some degree of proportional compensation for permanent partial impairments regardless of actual wage loss, but at reasonable cost to employers, is the pertinent legitimate government purpose *within the framework of the quid pro quo* here. To survive rational basis scrutiny for purposes of equal protection, § 39-71-703(2), MCA (2011), must rationally further *both* aspects of this relevant quid pro quo purpose. *See Caldwell*, *Satterlee*, and *Henry*, *supra*.

¶132   However, § 39-71-703(2), MCA (2011), categorically excludes and denies *any* form or level of compensation for one class of permanent partial impairments without wage loss, while continuing to compensate another class of permanent partial impairments without wage loss that is similarly situated but for a different relative severity subclass rating. Regardless of its acknowledged imprecision and experimental nature, I agree that neither Hensley, nor the Amicus, have shown that the medical methodology employed by the sixth edition of the AMA Guides is arbitrary. However, the constitutional problem is not with the validity of the methodology chosen to rate relative severity of injury. The problem is how the Legislature has, within the framework of the quid pro quo, chosen to use it to categorically deprive one class of otherwise similarly situated workers of *any*

76

compensation for a type of work-related loss previously compensable under the Act, and otherwise compensable in tort but for the new provision of the Act.

¶133   To that end, as in *Henry* and *Caldwell*, § 39-71-703(2), MCA (2011), is rationally related to only one aspect of the pertinent quid pro quo purpose of the Act—cost control. However, the categorical exclusion of compensation for Class 1 permanent partial impairments is not rationally related to the other aspect of the pertinent quid pro quo purpose of the Act—providing at least some substantial form of proportional compensation for permanent partial loss of physical function in return for depriving those workers of their remedy to obtain full compensation for that type of loss in tort.  Had the 2011 Legislature simply further discriminately reduced the level of compensation for workers with similar whole-body impairment ratings in some reasonable proportion to the new relative severity subclass scale, this would be a different case for equal protection purposes, provided that the Act continued to at least provide *some* substantial form of compensation for *all* permanent partial impairments without wage loss.  But that is not this case.

¶134 Here, like the discriminatory classifications in *Caldwell* and *Henry*, the discriminatory classification effected by § 39-71-703(2), MCA (2011), is contrary to and defeats one of the tandem aspects of the pertinent quid pro quo purpose of the Act by categorically excluding and denying *any* compensation for a class of work-related permanent partial impairments.  To hold otherwise would be to presume that, in revising § 39-71-703(2), MCA (2011), the Legislature intended to resubject employers to tort liability for non-economic damages, and potentially even punitive damages, for Class 1 permanent impairments without actual wage loss, as in *Stratemeyer II*.  However, nothing

77

in the language or legislative history of § 39-71-703(2), MCA (2011), indicates such a drastic intent. We must therefore presume that, in addition to controlling cost, the 2011 Legislature nevertheless intended to preserve the essential quid pro quo, thereby continuing to protect employers from tort liability, and subjecting § 39-71-703(2) to rational basis scrutiny within the framework of the quid pro quo of the Act. Thus, I would hold that, like the discriminatory classifications in *Henry* and *Caldwell*, § 39-71-703(2), MCA (2011), facially violates the equal protection guarantee of the Montana Constitution because it is not rationally related to the pertinent quid pro quo purpose of the Act as a whole.

¶135   I dissent.

/S/ DIRK M. SANDEFUR

Justice Ingrid Gustafson and Judge Jessica Fehr join in the Dissenting Opinion of Justice Sandefur.

/S/ INGRID GUSTAFSON
/S/ JESSICA FEHR
District Court Judge Jessica Fehr
sitting in place of Justice McKinnon

78